## STATE v. MORTENSEN.

No. 6006.   Decided October 11, 1938.   (83 P. 2d 261)

*T. A. Hunt,* of Richfield, for appellant.

*Joseph Chez,* Atty. Gen., and *Zelph S. Calder,* Deputy Atty. Gen., for the State.

WOLFE, Justice.

Appeal from a conviction of attempt to commit rape and from a sentence imposed thereon.  The assignment of error

which presents the question on which our decision must turn is the one which asserts error in permitting the case to go to the jury on an alleged insufficiency of evidence of intent to commit rape and insufficiency of evidence of an overt act, necessary to prove attempt.

The evidence is as follows: On October 10, 1937, defendant was playing a marble game at the Holland Inn, a public place in Salina, Utah. This attracted the attention of two girls each about ten years old. Defendant permitted them to push the lever or spring and gave them a nickel each and candy bars. Later he inquired if they wished to win some further money and invited them to meet him at the creek bridge over Salina Creek just out of Salina in about fifteen minutes. This they consented to do. The overtures were carried on in an undertone so that no one in the same room heard them, yet the departure of the girls with the defendant following them was noted by an older girl and two boys. This trio followed Mortensen. At the bridge defendant told the girls to go farther up the creek where he later joined them going by a different route. At this point he made arrangements for meeting them at a still more secluded place. At this rendezvous he solicited one of the girls with money to permit him to hug and kiss her and "have fun." He induced her to "ditch" her companion after having given each a nickel. He then repeated his request to the remaining girl to "have fun" with him. The evidence shows that there was about his entire conduct that which made the girls wonder whether he wanted to play "dirty" or "nasty" with them, but just what that meant to these girls is nowhere suggested or indicated. The girl testified:

"He said he would have a little fun and he would kiss me and hug me a little bit. Then he said, 'You sit down,' and I wouldn't do it and he started to slide toward me and I moved back."

She asked what he was going to do and he said, "Just have a little fun, and if I hurt you I will give you a quarter and you can go home." Then the girl's father came, having been

notified by the trio who followed Mortensen. He testified at the time he broke through the brush his daughter was three feet away from defendant.

I. While the jury had the advantage of witnesses' demeanor, there is nothing in the record nor could there be anything in the demeanor which would indicate what defendant really intended to do. The fact that he contemplated he might "hurt" her does not show that he intended to commit rape because he could have hurt her by taking indecent liberties. If, however, he had without words approached her with his penis exposed, or indicated by other acts that he intended to have intercourse with her, the jury could have inferred from his acts the intent. But as the case stands the minds of the jury would have to speculate as to what his intent was. It is not the case of permitting the jury to select inferences where one or more inferences might be drawn. In this case there is a dark area through which the mind of the jury must proceed from the evidence to a conclusion which makes such conclusion not one resulting from an inference but one resulting from a guess or speculation. This is not a case which is exemplified by *People* v. *Stites*, 75 Cal. 570, 17 P. 693, where one while apprehended secreted a bomb, or like the illustration given in *Commonwealth* v. *Peaslee*, 177 Mass. 267, 59 N. E. 55, where a person went into a stall with a poisoned potato. In such cases the intent to use the thing in possession may be inferred from the possession plus other circumstances. But this cannot be the same in rape because no inference can be taken from the mere possession of something, the possession of which the accused cannot dispense with. Hence, unless there are some indications by expression or by conduct which would indicate that what the defendant accused of attempt to rape was going to do was actually to have intercourse with the girl, the intent to commit rape, which is an element in the crime of attempting to commit rape, is not made out. There was in this case not sufficient evidence of intention to commit rape.

II. There was not an overt act sufficient to constitute an attempt to commit rape. There was nothing but solicitation and persuasion, coupled with a "sliding" movement of defendant while seated on the grass. The legal inability of a girl under thirteen to give consent to sexual intercourse with a man not her husband cannot make an overt act that which does not tend to effect the commission of the crime.

What constitutes an overt act under the statute is characterized as an act "done with intent to commit a crime, and tending but failing to effect its commission." Sec. 103-1-29, R. S. U. 1933. In this case the act which it was sought to characterize as an overt act was the "sliding" motion toward the girl. In order to hold this an overt act, it must have been done with the purpose to commit an act of intercourse with the girl. But there is no evidence that it was intended for that purpose, partly because there is no evidence that he intended even to commit rape. From all that appears he may have been moving towards her merely to further his solicitations or to "have fun" in other ways than the committing of rape.

It is uniformly held that there must be an overt act tending, and fairly designed to effectuate, the commission of the crime of statutory rape. *Rainey* v. *Commonwealth*, 169 Va. 892, 193 S. E. 501, 502; *Rose* v. *State*, 32 Okl. Cr. 294, 240 P. 754; *People* v. *Parker*, 74 Cal. App. 540, 546-547, 241 P. 401; *State* v. *Gill*, 101 W. Va. 242, 244, 245, 132 S. E. 490; *McEwing* v. *State*, 134 Tenn. 649, 654, 655, 185 S. W. 688; *In re Lloyd*, 51 Kan. 501, 33 P. 307, 308; *Perrin* v. *State*, 50 Okl. Cr. 237, 297 P. 314, 315; *Weaver* v. *State*, 16 Okl. Cr. 564, 185 P. 447; *State* v. *Harney*, 101 Mo. 470, 14 S. W. 657; 52 C. J. 1032; 22 R. C. L. 1235; 33 Cyc. 1431. Several borderline cases are hereunder given, some holding that an attempt had been committed and others that the acts fell short of that. But in all of the cases where it was held that an attempt had been made there were acts which

showed definitely an intent of the man to use his privates, which act was one also in the course of the process directly designed to the consummation of the intercourse and past the line of preparation. *People* v. *Welsh,* 7 Cal. 2d 209, 60 P. 2d 124; *Rainey* v. *Commonwealth,* supra; *Vaughn* v. *Commonwealth,* 262 Ky. 588, 90 S. W. 2d 1037; *State* v. *Pierpoint,* 38 Nev. 173, 147 P. 214; *Payne* v. *Commonwealth,* 110 S. W. 311, 33 Ky. Law Rep. 229; *McEwing* v. *State,* supra; *Hart* v. *Commonwealth,* 131 Va. 726, 109 S. E. 582.

In all of the above cases the overt act charged and proved was fairly designed to accomplish the act of intercourse. All present acts involving the commission of the crime and had started on their way to consummate the ultimate act of intercourse intended. In the present case there is no act which can be said to be designed to accomplish the act of intercourse. Without such an act there can be no "attempt" to commit rape.

The following cases hold that the acts had not gone far enough to constitute an attempt. In *State* v. *Gill,* supra, it was said [page 491]:

"The evidence of Gladys is that she and the defendant were alone for about 15 minutes in an automobile, with the lights turned off, one dark night near midnight, on a country road, during which period the defendant held her in his arms; that he put one hand under her dress; that she told him to stop and he did stop; that he did not 'get hold' of her body or any part of her person; that he did not say what he was trying to do; and that he did not try to have sexual intercourse with her. * * * The reports are replete with cases in which the conduct of the defendants was even more contemptible than that of Gill, and in which the liberties taken were far more indecent than those taken by him, but wherein convictions were not sustained. See cases already cited, and *Stoker* v. *State,* 93 Tex. Cr. R. 24, 245 S. W. 444; *Anderson* v. *State,* 77 Ark. 37, 90 S. W. 846; *Commonwealth* v. *Merrill,* 14 Gray (Mass.) 415, 77 Am. Dec. 336; *State* v. *Perkins,* 31 S. D. 447, 141 N. W. 364; *State* v. *Riseling,* 186 Mo. 521, 85 S. W. 372." *Weaver* v. *State,* supra; *State* v. *Harney,* 101 Mo. 470, 14 S. W. 657.

No case has been found where conviction was sustained on facts so questionable and an alleged overt act so equivocal as in this case. The judgment is reversed. ■

FOLLAND, C. J., and MOFFAT, J., concur.

HANSON, Justice (dissenting)

I dissent. We all agree that an overt act must be shown. I dissent from the conclusion that an overt act was not shown. In the following summary the names Anna and Anna Mae are substituted for the true names of the two girls most concerned. Anna testified:

"I am eleven years old. I had not seen Mr. Mortensen until that Sunday at the Holland Inn. He was playing the machine. Anna Mae was with me. He put nickels in the machine and let us shoot it by turns. He gave us some money to buy candy bars. We went home to dinner and returned, and he still let us play the machine. He asked us if we wanted to win some money. We said 'Yea,' and he told us to go down to the creek bridge where he would meet us in about fifteen minutes. We hurried down there and Mr. Mortensen came in a few minutes. He then told us to go up the creek a little further and he would meet us. We hurried up. * * * and Gilbert was sitting by a tree waiting for us, near the creek. He said go up the creek further and I will meet you there. I said, 'all the further we will go is to the flume.' He said, 'All right, there are some kids here.' We hurried up to the flume and crossed the creek to a little hill, and there we saw him climbing the fence. When he came out of the willows he motioned for us to come where he was. Anna Mae started to run and said, 'I am going home.' I told her to come back. Then she asked him if he was going to play dirty, and he said, 'No, I am too big for that.' Then he said, 'Do you want two nickels?' We said, 'Yes,' and he handed out two nickels and went down by the fence. I went across the fence to get the money. He gave me my nickel but not Anna Mae's nickel. So she went over the fence and got her nickel and came back, and started to go; I told her to wait. He said, 'You ditch Anna Mae and come back here in ten minutes, and we will have a little fun, and he would hug and kiss me a little.'

"I went across the fence where Anna Mae was waiting for me. I was going home. I gave Lorraine the nickels, and she told me to go back. I went down across the fence on the opposite side of the creek from the other children. He came down by the fence and sat down by the bushes, I stood by the fence. He said, 'Don't you want to earn

some money?' I said, 'Yes, but I don't know how; what are you going to do?' He said, 'I am just going to have a little fun.' He said, 'You have a sister, haven't you.' He said some funny name I couldn't understand him, and said, 'Isn't it true?' I said, 'No.' He said, 'Well, she likes to have fun.' He said, 'You sit down.' I wouldn't do it; he started to slide over toward me, and I moved back. I said, 'What are you going to do?' He said, 'Just have a little fun, and if I hurt you I will give you a quarter and you can go home.'

"I heard something and said, 'Someone is there.' He said, 'It is only a stick hitting the flume; don't you want to have some fun.' I said, 'I don't know what you are going to do.' He said, 'Just have a little fun.' Then I saw Lorraine and the other children running down the railroad tracks, and I said, 'There is my daddy now.' He said, 'Where?' I said, 'Right up there.' Daddy hollered at me and I went up toward the flume crying. He said, 'Why did you coax these girls down here?' Mr. Mortensen said, 'I didn't coax these girls down here.' I said, 'You did, and hollered at Anna Mae, 'Didn't he coax us down here?' And Anna Mae said, 'Yes.' I went down to the car (automobile) and I don't know what happened after that."

Anna Mae corroborated the foregoing and said that it was after she received her nickel from Mortensen and then "ran across there" that she first saw Lorraine, Jackie Steele and Sherrill Crane since they left the Holland Inn. And that she didn't see Anna after that until the latter's father came.

Lorraine, Jackie and Sherrill each testified, in substantial agreement, that they were in the Holland Inn on the Sunday in question when Gilbert Mortensen was playing the nickel in slot machine with the two girls Anna and Anna Mae; that they heard no conversation between Mortensen and the girls but saw the girls go out, Mortensen following them. Lorraine and the two boys also soon left the Inn, keeping Mortensen and the two Annas within view. They saw the two girls go up the creek from the bridge, and Mortensen go up the road, south. Next they saw Mortensen about a block from the bridge on the creek bed. From there Mortensen and the girls went up the creek to the flume. The other party followed. They heard them talking but could not tell what was said. Lorraine, Jackie and Sherrill were hiding there about ten minutes. Then they went across the creek on the

railroad track. Jack ran for the town marshal. He came back with Anna's father. After that they all went home.

Anna's father testified that he went to the flume in his car on learning that his daughter was there with Mortensen. Found them under the culvert in some willows. He called his daughter; called Mortensen some names. Mortensen said that he had been sitting there all day. The father called him a liar, took the kids and went home.

I dissent from the majority view that an exposure by Mortensen of his male organ to the girl and a declaration of his purpose to use it is the only overt act such a case admits of, if that be the position of the majority opinion. Section 103-1-29, R. S. Utah 1933, defines a criminal attempt as "any act done with intent to commit a crime * * * but failing to effect its commission." A girl under thirteen years of age is incapable of legal consent. Force is not an essential element. Any act from which the jury can discern an intention to commit the act of sexual intercourse with a girl under that age unless prevented, is an overt act. Before rape can be accomplished in such case, the attempter must gain possession of the girl's person. She must surrender or submit her body to the act of rape, or else the attempter must take possession by force. In either case, if the designed consummation follows, it is rape. To induce submission to such design, the attempter may employ either force, persuasion, rewards, enticements, or even acts of fraud. Yet violent rape and persuasive rape have equal criminality in such case. Hence, the overt act may be that suitable to the method and means employed to gain the consent, the surrender of the girl's person to the act intended. Any act designed and intended to bring about such surrender and submission to the unlawful act, though willingly, is just as much an attempt as is an act of force, or threatened force inducing fear and submission. Before the attempter can have his way with the girl's body, he must first overcome and conquer her mind, her will to withhold her body from use in the illegal act. Any act of persuasion, reward, or enticement operating upon

the girl's mind to induce submission of her body to the intended use is as much an attempt at rape as is force directly acting upon her body. Reason instructs us also that where a desired end may be accomplished by soft words, persuasion, and a small outlay in money, it will be preferred to an act of force which may defeat its own object by provoking resistance or flight. One about to burglarize a house does not give advance notice to its occupants. One about to debauch and violate a young girl's person does not at once brazenly expose his nakedness and declare his purpose to penetrate her person with it. Instead, he sugars and softens his words, offers inducements, and quiets the girl's natural apprehensions of pain or impropriety. He lures her to a place of seclusion with specious pretenses. Then he seeks by cunning means to effect contact with her person. His professed desire to hug, kiss and embrace are but a light disguise for declared lust.

Reason tells us that if, in such case, the female is prone to resist or refuse submission of her body to such a purpose, she will do so before her person is touched. The art employed is to quiet apprehension and gently lead her to submission. When she is firmly within his embraces, or lies prostrate before him, she is already entangled in his web and under the dominion of his will. His overt acts have already been employed and his conquest has occured, before he makes indecent display of his parts. The overt acts precede the actual assault. He has already overtly contrived and accomplished privacy with the girl in a place of seclusion. He has overtly practiced persuasion, offered a reward or inducement, and solicited contact with her person. In this case he had, in addition, induced one of the girls to ditch her companion, that is, to retire her from their immediate presence. He offered her a little money to permit him to embrace her and have fun; more money if he should hurt her in the act. In the nick of time she saw her father coming, and ran crying from his presence.

There is a well defined difference between the offenses defined as an attempt to commit rape and an assault with intent to commit rape. A different overt act is requisite in each, as the offenses themselves are different. In *State* v. *Hyams*, 64 Utah 285, 230 P. 349, we held that there is such difference between the two offenses that a verdict of guilty of attempted rape will not sustain a judgment of conviction of assault with intent to commit rape. See, also, *State* v. *Smith*, 90 Utah 482, 62 P. 2d 1110. This is a clear recognition of the principle that an attempt, or the overt act which is the initial stage thereof, does not require a physical act in the way of an assault or advance upon the person of the intended victim. This view is also in harmony with decisions elsewhere. To require proof of indecent liberties with the female's person (or what is like it, indecent exposure of the attempter's male organ to the female with an indication of purpose to use it) is to require proof of an assault to commit rape, rather than a mere attempt short of an assault. 5 C. J. 721, Sec. 181, note 36 and cases cited. An attempt is any act done with the intent, and contributing to the success, of the crime attempted. It need not be the last proximate act. 16 C. J. 114. It need not involve an actual assault. Id. p. 115, n. 33-34. By the weight of authority it is indictable at common law to solicit another to commit a felony, although the solicitation prove ineffectual and the crime is not committed. Id. p. 117 n. 63, and many cases. So held with respect to solicitations to commit sodomy, adultery, and other crimes mentioned. Id. p. 118, n. 64-69, and cases. Solicitation accompanied by another overt act is more than mere solicitation. Id., p. 118-119, Sec. 98, and cases. At bar we have not merely solicitation but contrived seclusion and rewards offered, increasing in case of pain, and a sliding approach to the girl solicited.

In charging attempted rape of a girl under age of consent it is only necessary to allege and prove acts leading to and which would have resulted in rape had the purpose been consummated. 55 C. J. 1049, Sec. 70. The overt act may consist

of threats producing fear, or acts of fraud inducing consent. Id. p. 1049, Secs. 71-72, and p. 1058 Sec. 83. Yet threats inducing fear only influence the mind; and so does an offer of reward tend to influence the mind which stands guardian over the body.

In *State* v. *Evans*, 27 Utah 12, 73 P. 1047, we say that "an attempt in any form" [page 1048] is within the statute prohibiting criminal attempts. Our statute, R. S. U. 1933, 103-1-29, says substantially the same thing. In *State* v. *Prince*, 75 Utah 205, 284 P. 108, we held that mere verbal threats tending to produce fear, and fear to induce submission to a criminal design to extort money, is an overt act in such an attempt. Here we have not threats but promises of money to induce submission to a criminal design and request.

In *Payne* v. *Commonwealth*, 110 S. W. 311, 33 Ky. Law Rep. 229, it was held that an overt act in attempted rape need not amount to a technical trespass. And in *Burton* v. *State*, 8 Ala. App. 295, 62 So. 394; *Taff* v. *State*, 69 Tex. Cr. R. 528, 155 S. W. 214; *Ross* v. *State*, 16 Wyo. 285, 93 P. 299, 94 P. 217, it was held that the overt act in attempted rape need not proceed so far as an assault, that is, an unlawful or threatening advance. In *State* v. *George*, 79 Wash. 262, 140 P. 337, it was held that attempted sodomy does not imply or require a physical act, but that it may consist only of solicitation, persuasion or threats, requires no assault, and, according to Mr. Bishop, is indictable even though the person approached declines the persuasion.

In *State* v. *Bowers*, 35 S. C. 262, 14 S. E. 488, 15 L. R. A. 199, 28 Am. St. Rep. 847, it was held that the mere solicitation of forgery is an indictable attempt. In *People* v. *Mills*, 41 Misc. 195, 83 N. Y. S. 947, that solicitation of theft of public records supports a conviction of the attempted theft. In *Com.* v. *Jacobs*, 9 Allen 274, 91 Mass. 274, that solicitation to enlist for military service abroad supports conviction. And in the following cases that solicitation is an overt act in attempted arson: *State* v. *Hayes*, 78 Mo. 307; *State* v. *Dumas*, 118 Minn. 77, 136 N. W. 311, 41 L. R. A., N. S., 439;

552

and *Commonwealth* v. *Peaslee,* 177 Mass. 267, 59 N. E. 55. In *Griffin* v. *State,* 26 Ga. 493, the overt act of attempted house-breaking was the taking of the impression of a key to a lock with which to enter a house for theft and the employing of another to enter and steal.

The jury in this case was warranted in concluding from the evidence, as they did, that the defendant was guilty of an attempt to rape and had committed overt acts leading thereto, adapted in their nature to his purpose and promoting its accomplishment, while he was yet only weaving his web, trying to persuade the girl to surrender her person to his embraces, offering her money, and more money if he should hurt her. His conduct carried sexual implications and evinced a lustful design. So the girls understood him, and so the two boys and girl who awaited developments in hiding—so the boy who ran for an officer and returned with the girl's father. So the jury who convicted him of attempting what his acts manifestly implied.

In my opinion the judgment of conviction should be affirmed.

LARSON, Justice.

I concur in the views expressed by Mr. Justice HANSON in his dissenting opinion.