**STATE of Utah, Plaintiff and Respondent,**

v.

**Kenneth Eugene GOTFREY, Defendant and Appellant.**

No. 15804.

Supreme Court of Utah.

July 26, 1979.

---

**3.** See Footnote 1, *supra.*

Bryce K. Bryner, Helper, for defendant and appellant.

Robert B. Hansen, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

CROCKETT, Chief Justice:

Defendant Kenneth Gotfrey appeals from his conviction by a jury on two counts of statutory rape,[1] and one count of forcible sodomy,[2] on all of which he had been jointly charged. His grounds of attack are: (1) Insufficiency of the evidence, (2) error in denying his claim of a psychologist-patient privilege, and (3) in denying defendant's motion to quash the information for improper joinder of offenses therein.

The acts of statutory rape charged were upon defendant's step-daughters. Petrita Garcia testified that on September 11, 1975, (she was then 12 years of age) the defendant jerked her into a bedroom in their mobile home at Wellington, Utah, made her take off her clothes and had intercourse with her. Though the evidence was focused upon that occurrence, she also testified that the same thing had happened many times (at least 20 times) before. The other was a year and a half later, another step-daughter, Rosie Garcia, testified that on March 15, 1977, (who by then had also become 12 years old) the defendant took her in the bedroom, undressed her, and had sexual intercourse with her. She also testified that the same thing had happened many times before.

The charge of sodomy was upon the brother of the two girls above referred to, step-son Michael Gene Garcia, 16 years old. He related that the incident occurred on October 23, 1976 on a deer hunt in Carbon County. He said that while he was in bed in the deer-camp tent, and while his cousin, an eight year old boy was also sleeping in the tent, the defendant left several men by the camp fire about 15 to 20 feet away, came into the tent and by threats of violence committed the act of sodomy upon him.

Carbon County Sheriff Albert Passic testified that in connection with his investigation of these matters the defendant told him that he had "undressed and played with" the little girls. Mr. Brian Matsuda, a juvenile probation officer, also testified that Gotfrey admitted having intercourse with the girls. Bobby Joe Fredrickson, who gave his credentials as a clinical psychologist at the government agency Four Corners Mental Health in Price, Utah, testified that during a therapy session Gotfrey volunteered that he had had sexual intercourse with the two step-daughters.

Defendant's first contention, that the evidence was not sufficient to justify the verdict of guilty of forcible sodomy and rape, is disposed of by these observations as to the standard and well-established rules of review of evidence by an appellate court: that we recognize the prerogative of the jury as the exclusive judges of its credibility; and that where the evidence is in dispute, we are obliged to assume that the jury believed those aspects of the evidence which support their verdict;[3] and that, in doing so, there is a reasonable basis therein upon which the jury could believe that the defendant committed those offenses as charged.

The assignment that the court committed error in refusing to allow the defendant to invoke a privilege between him and Mr. Fredrickson is based on our statute Sec. 58–25–8, U.C.A.1953, which states:

A psychologist licensed under the provisions of this act cannot, without the consent of his client or patient, be examined in a civil or criminal action as to any information acquired . . . in behalf of the client . . .

The effect of that statute is to create another privilege and thus close another win-

---

1. 76–5–402(2), U.C.A.1953 provides that: Rape is a felony of the second degree unless the victim is under the age of 14, in which case the offense is punishable as a felony of the first degree.

2. As provided by 76–5–403, U.C.A.1953.

3. See *State v. Seymour*, 18 Utah 2d 153, 417 P.2d 655; *Titus v. State*, Okl.Cr., 351 P.2d 1021.

dow to the light of truth. It is neither our duty nor prerogative to pass upon the wisdom of such a legislative enactment. But because it has the effect just stated, it should be strictly construed and applied;[4] and should not be extended to persons merely acting as agents for or under the direction of licensed psychologists, as defendant urges. Mr. Fredrickson's own testimony indicates that he had not become a licensed psychologist as required by Sec. 58–25–2, U.C.A.1953. The trial court therefore acted properly in not allowing the defendant to claim the privilege.[5]

The question of more vital concern is whether the court committed error in refusing to sever the charges so the defendant could have a separate trial on each.

Our statute Sec. 77–21–31, U.C.A.1953 permits the charging of several crimes in a single indictment or information when they, ". . . are of the same or similar character, or are based on the same act or transaction, or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

■ The purpose of that statute is to allow joinder of offenses and thus eliminate multiple prosecutions to conserve time and effort when justice can best be served thereby. But care must be taken that the statute is not misused to deprive an accused of a fair trial upon an offense by joining different offenses so that evidence concerning charges unrelated in time and nature, which would normally not be admissible upon a trial, could be admitted as to the multiple offenses in an effort to stigmatize the defendant and thus make it questionable that the jury would give a fair and dispassionate consideration to the evidence on the first charge.[6]

■ Considered in the light of what has just been said, we are impelled to conclude that the separate and different charges of rape upon the step-daughters and of sodomy involving the step-son are not of such similarity in character and circumstances of commission that, considering fairness to the defendant, they should have joined under the statute above referred to. This is true because it will be noted that the two charges of rape relate to incidents several months apart and with different victims; and that the charge of sodomy is a separate and distinct offense with different elements.[7]

It is regrettable that the misjoinder of the three charges necessitates a reversal of the convictions when the evidence appears to be sufficient to sustain them. Nevertheless, the defendant is entitled to a trial without any error of sufficient substance that in its absence there is a reasonable likelihood that there would have been a different result. We cannot conclude with assurance that the joinder of these three offenses, and allowing the jury to hear evidence of all three of them together in a single trial, did not so affect the proceeding as to deprive the defendant of a fair trial.

It is therefore necessary that the judgments be reversed, and that the three charges be severed; and the case be remanded for such further proceedings as may be deemed appropriate.[8] No costs awarded.

WILKINS and HALL, JJ., concur.

STEWART, Justice (concurring in part and dissenting in part).

I agree that this case should be reversed for a new trial for the reasons stated by the majority.

---

**4.** *Gord v. Salt Lake City*, 20 Utah 2d 138, 434 P.2d 449.

**5.** We discuss the other assignments of error, notwithstanding the reversal on a different ground, because of the provision of Rule 76(a), U.R.C.P. to the effect that upon remand for further proceedings the court shall pass upon questions of law that may be involved; see also *LeGrand Johnson Corp. v. Peterson*, 18 Utah 2d 260, 420 P.2d 615.

**6.** See *Cassidy v. Second Judicial District Court*, 109 Utah 519, 167 P.2d 970.

**7.** Compare 76–5–402, U.C.A.1953 with 76–5–403, U.C.A.1953.

**8.** That defendant is not entitled to dismissal of the charges, but to a new trial thereon see *State v. Jaramillo*, 25 Utah 2d 328, 481 P.2d 394.

However, I dissent from the majority's view of the scope of the psychologist-patient privilege. The effect of the interpretation of that privilege is to make an invidious discrimination in the quality of psychological services available to a person who can afford to consult a private practitioner and the quality of service which lesser advantaged persons may receive when seeking the same services from a government sponsored institution.

Section 58–25–8, U.C.A. (1953), as amended, provides:

A psychologist licensed under the provisions of this act cannot, without the consent of his client or patient, be examined in a civil or criminal action as to any information acquired in the course of his professional services in behalf of the client. In other matters a licensed psychologist's relationship with his client or patient shall be accorded the same privileged communication as the relationship between an attorney and his client.

The majority opinion holds that this provision should be strictly construed to protect only communications made to a "licensed psychologist," and "should not be extended to any persons merely acting as agents for or under the direction of licensed psychologists, as defendant urges." On that basis the majority accordingly affirms the admission of Mr. Fredrickson's testimony which related damaging admissions made to Mr. Fredrickson by the defendant.

The majority opinion states that every evidentiary privilege has the effect of closing "another window to the light of truth" in the adjudicatory process. However, the majority does not contend, and I do not believe it to be the case, that the judicial search for truth has been unduly hampered by the various evidentiary privileges, some of which are of ancient origin and founded on the promotion of highly worthy values. That the search for truth in the judicial process is the first predicate of justice cannot be denied. But generally there is more than one source of evidence for any given fact. Certainly our society has not accepted the proposition that the judicial search for truth should override all instances where confidentiality and privacy support basic values of human life. To be sure, nondisclosure must be justified by powerful considerations, and although some evidentiary privileges rest on firmer foundations than do others, few privileges are supported by such weighty considerations as those that underlie the psychologist-patient privilege.

The policy underlying that privilege is rooted in the belief that individuals and society at large may be greatly benefited by fostering a sound therapeutic relationship in the interest of preserving families, enhancing individual development and growth, and allowing persons to deal with problems which might otherwise erupt into serious individual and societal difficulties, at least some of which would likely end up in the court system by way of divorces, crime, and juvenile delinquencies. The beneficial effects that may emerge from a therapeutic relationship cannot be fully achieved, and perhaps cannot be achieved at all, unless there is a trusting relationship between a psychologist and patient which is founded on a sense of complete confidentiality. Only on that basis are most persons willing to open up their innermost personalities and disclose the most private and sometimes painful aspects of their inner selves. At least in some measure, the privilege in question is supported by considerations similar to those that support the priest-penitent privilege, the doctor-patient privilege and the husband-wife privilege.

The importance of the evidentiary privilege at issue is underscored by the fact that a psychotherapist privilege, with which Section 58–25–8 is essentially concerned, may have some constitutional foundation. The California Supreme Court in *In re Lifschutz,* 2 Cal.3d 415, 85 Cal.Rptr. 829, 467 P.2d 557, 567 (1970) stated "We believe that a patient's interest in keeping such confidential revelations from public purview, in retaining this substantial privacy, has deep-

er roots than the California statute and draws sustenance *from our constitutional heritage.*" See also opinion of Justice Manderino in *In re "B"*, 482 Pa. 471, 394 A.2d 419 (1978). These decisions receive some support from the developing area of the privacy protected by the Constitution. See *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *Roberts v. Clement*, 252 F.Supp. 835 (D.C.Tenn.1966); *Finot v. Pasadena Board of Education*, 250 Cal.App.2d 189, 58 Cal.Rptr. 520 (1967).

The issue which appears to be presented in the instant case is whether admissions made to a person who is not a licensed psychologist are nevertheless privileged. It is clear that the Psychologist's Licensing Act, which contains the provision concerning privileged communications, was designed to assure the public that those who hold themselves out as psychologists are adequately trained and qualified to engage in the practice of psychology. The Act, however, specifically exempts from licensure a psychologist employed by a federal, state, county, municipal or chartered educational institution, see Section 58–25–6, U.C.A. (1953), as amended. The theory underlying this exemption is that such institutions can made valid judgments as to the competence of a psychologist to serve the public at large, without his having been licensed. In short, employment by such an institution may be tantamount to licensure depending upon the job description and training requirement of the psychologist.

To be licensed under the Psychologist's Licensing Act, a person must have a decorate degree based on a program of studies "whose content was primarily psychological from an accredited educational institution." Section 58–25–2, U.C.A. (1953), as amended. If a psychologist is employed by such an exempt institution, meets those qualifications, and his job description at the institution contemplates the performance of diagnostic or therapeutic functions, he should be viewed, so far as the privilege is concerned, in the same manner as a licensed psychologist. Of course, those services must be performed under circumstances in which a reasonable person would expect his disclosures to be held confidential.

Patients who consult psychologists at the exempted institutions should have the same right of privacy and confidentially as those who consult a private practitioner. To hold otherwise would tend to defeat the very purposes of the public institution in offering psychological services. Moreover, it is generally less affluent persons who seek assistance from public institutions. If those who seek help from public institutions are not assured of the necessary confidentiality, the assistance rendered will be less efficacious and perhaps of no help at all. Such a result is a loss generally to society and tends to discriminate against those using public institutions on a totally irrational and arbitrary basis. I do not believe the Legislature intended that result. The statute does not expressly preclude the rule as I have stated it; nor is it beyond the powers of this Court, which is charged with the responsibility of developing the common law, to fashion a rule to avoid caprice and arbitrariness.

Mr. Fredrickson testified that he was a clinical psychologist and that the admissions were made during an interview which Mr. Fredrickson characterized as a therapy session, although it does not appear that the defendant consulted Mr. Fredrickson on more than one occasion. Nor does it appear that Mr. Fredrickson held a Ph.D. degree from an accredited department of psychology. Further, it does not appear in the record whether Mr. Fredrickson performed his duties under the direct supervision of a licensed psychologist, and there is nothing in the record to indicate whether the institution for which Mr. Fredrickson worked was a public or privately-financed institution. Disclosures made to Mr. Fredrickson might still, however, be privileged. He worked with a licensed psychologist, but the

nature of that relationship is not clear. In any event, it should be noted that the majority statement that the privilege "should not be extended to [any] persons merely acting as agents for or under the direction of licensed psychologists . . ." is not in all respects consistent with Section 58–25–8. The last sentence of that section provides: "In other matters a licensed psychologist's relationship with his client or patient shall be accorded the same privileged communication as the relationship between an attorney and his client." Whether Mr. Fredrickson's relationship to the licensed psychologist employed at Four Corners Mental Health was of such a character as to justify application of the privilege depends upon an analogy to the attorney-client privilege, and especially whether Mr. Fredrickson was performing duties which were necessary to enable the licensed psychologist to render professional services whose content would be covered by the privilege.

MAUGHAN, J., concurs in the views expressed in the concurring and dissenting opinion of STEWART, J.