**STATE of Utah, Plaintiff and Appellee,**

v.

**Frederick Joseph GERMONTO, Defendant and Appellant.**

No. 900375.

Supreme Court of Utah.

Nov. 15, 1993.

## FACTS

In January 1989, Gilbert Lisonbee, the 85–year–old victim, called the Valley Store Front, a mental health treatment and referral center for transients, to find someone to shovel snow from his walk. While at the Valley Store Front, Germonto learned of the job, and on January 6 he went to Mr. Lisonbee's home to perform the task.

Germonto testified that he returned to Mr. Lisonbee's home on January 9 to ask for help in locating an apartment. He claimed that Mr. Lisonbee invited him in, as he had done previously. According to Germonto, he offered to repair Mr. Lisonbee's toilet, using a large crescent wrench he found in the bathroom. Mr. Lisonbee apparently noticed that Germonto was behaving erratically and elicited the explanation that Germonto had taken some "weird speed" that morning. Mr. Lisonbee left the bathroom, and Germonto followed him to the kitchen, where Mr. Lisonbee picked up a knife and ordered Germonto to leave. Still holding the crescent wrench, Germonto attempted to go around Mr. Lisonbee to retrieve his coat before leaving. In the process, Mr. Lisonbee allegedly "somehow" cut Germonto's hand. Other witnesses disputed Mr. Lisonbee's ability to wield a knife, testifying that his hands were extremely arthritic, crippled-looking, and deformed and that he had difficulty writing and holding objects. After Mr. Lisonbee allegedly cut him, Germonto hit Mr. Lisonbee over the head with the wrench.

Germonto claims that he then lost consciousness and that when he awoke he was holding the wrench and standing over Mr. Lisonbee, who was motionless on the living room floor. He could not remember how the incident, which began in the kitchen, ended in the living room, nor could he recall how many times he struck Mr. Lisonbee. He testified that he returned the wrench to the bathroom and washed the blood from his cut hand. After realizing the gravity of the situation, he covered Mr. Lisonbee's body with bedding to conceal it. Germonto did not know whether Mr. Lisonbee was still alive, and he did not attempt to help him.

R. Paul Van Dam, Atty. Gen. and Christine Soltis, Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Curtis C. Nesset, Salt Lake City, for defendant and appellant.

DURHAM, Justice:

Frederick Joseph Germonto appeals from his convictions for murder in the second degree, a first degree felony, in violation of Utah Code Ann. § 76–5–203; robbery, a second degree felony, in violation of Utah Code Ann. § 76–6–301; and forgery, a second degree felony, in violation of Utah Code Ann. § 76–6–501. We affirm.

Germonto testified that at that point he decided to leave town. To effectuate his departure, he took a ring and a checkbook from Mr. Lisonbee. He wrote a check to himself for $273 and attempted to cash it at several locations before succeeding at Mr. Lisonbee's bank. Next, Germonto went to the home of Vernon Graham, where he showered, changed clothing, and asked for a ride to Provo so that he could catch a bus out of town.

Graham noticed that Germonto's pants were dirty with what appeared to be rust stains. In addition, he characterized Germonto as appearing "jumpy." Graham and his brother noticed that Germonto was wearing a diamond ring which he said someone had given him. Germonto also said that he had just been paid. Asked about the cut on his hand, Germonto claimed that he had cut himself at work. Responding to Germonto's apparent desire to leave town quickly, Graham's brother asked him jokingly, "So, Joseph, who'd you kill?" Germonto responded, "You'll read about me in the paper."

Later that day, Mr. Lisonbee's companion and a neighbor found the body in the living room, concealed under the bedding. The house was in a state of disarray, with blood and broken items found throughout.

Mr. Lisonbee died of multiple blunt force injuries. The medical examiner testified that he found evidence of at least twenty-five blows inflicted with, among other things, a large wrench and a glass object similar to a broken vase found in the living room. The temporal order of the blows was unclear. The medical examiner also testified that Mr. Lisonbee may have lived for one to fifteen minutes after the blows were inflicted.

In January 1989, Germonto was charged with forgery, a second degree felony, in violation of Utah Code Ann. § 76–6–501. When he was arrested six months later, he was charged with murder in the second degree, a first degree felony, in violation of Utah Code Ann. § 76–5–203; and robbery, in violation of Utah Code Ann. § 76–6–301, or alternatively, burglary, in violation of Utah Code Ann. § 76–6–202, both second degree felonies. In January 1990, the two sets of charges were consolidated in an amended information.

On May 8, 1990, a jury convicted Germonto of second degree murder, robbery, and forgery. He was sentenced to five years to life for the murder and to concurrent terms of one to fifteen years for the robbery and forgery convictions, those terms to be served consecutively to the murder sentence.

Germonto appeals from the convictions. His opening brief, filed by the Salt Lake Legal Defender Association (LDA), alleges the following infirmities: First, he contends that the trial court erred in failing to require the jury to reach a unanimous verdict on the theory of second degree murder underlying the conviction. Second, he claims that the alternative charges of robbery and burglary were duplicitous, which violated his due process rights and rights against double jeopardy. Third, he assigns as error the joinder of the forgery case with the other offenses because he claims it was not part of the same criminal episode. Fourth, he challenges the jury instruction on the defense of habitation as improper and prejudicial. Finally, he attacks the prosecutor's discussion of attorney-client communications as plain error.

Germonto also filed a pro se brief reiterating the arguments advanced in the LDA brief and submitting several new claims. In that brief, he accuses the coroner of giving perjured testimony concerning Mr. Lisonbee's death and alleges numerous instances of prosecutorial misconduct. In addition, he claims that his trial counsel provided ineffective assistance. Finally, he challenges the sufficiency of the evidence supporting his convictions.

The State moved to strike the pro se brief. This court denied the motion but advised LDA to withdraw as counsel. New counsel filed a supplemental brief advancing two arguments: that the robbery charge should have been dismissed and that trial counsel was ineffective. After the State filed its brief in response, this court granted Germonto additional time to address the issue of jury unanimity in the context of ineffective assistance of counsel. New counsel filed a reply brief, raising the jury unanimity issue in the context of ineffective assistance of counsel, challenging the joinder of the charges, at-

tacking the defense-of-habitation instruction, questioning the sufficiency of the evidence for the robbery conviction, and assailing the prosecutor's conduct and defense counsel's failure to object to that conduct.

## DEFENDANT'S PRO SE BRIEF

██ Germonto raised several issues in his pro se brief without providing citations to the record or otherwise marshaling the evidence to support his arguments, as required by the rules of appellate procedure. Utah R.App.P. 24(a), (e). Despite its procedural shortcomings, this court denied the State's motion to strike the pro se brief; instead, we advised new counsel to consider the brief in filing a supplemental brief. That counsel chose not to withdraw the pro se brief but did not elaborate or provide the requisite record citations or evidentiary support. We are therefore free to disregard it. Utah R.App.P. 24(k). Furthermore, we find that the errors alleged only in the pro se brief, if properly presented, would not amount to reversible error and therefore do not require full analysis. *State v. Allen,* 839 P.2d 291, 303 (Utah 1992); *State v. Carter,* 776 P.2d 886, 888–89 (Utah 1989). Accordingly, we do not treat the issues raised in the pro se brief, except to the extent they are properly raised and supported in the supplemental briefs filed by substitute counsel.

## SUFFICIENCY OF EVIDENCE FOR ROBBERY CONVICTION

██ Germonto claims that the trial court should have dismissed the robbery charge because the State failed to adduce any evidence that the robbery was accomplished "by means of force or fear," as required by statute. In the alternative, he argues that the robbery conviction is not supported by sufficient evidence.

In considering the challenge to the sufficiency of the evidence, we review the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict. *State v. Verde,* 770 P.2d 116, 124 (Utah 1989). If, during our review, we find some evidence or inferences upon which findings of all the requisite elements of the crime can reasonably be made, we affirm. *State v.*

*Booker,* 709 P.2d 342, 345 (Utah 1985). We will reverse a jury verdict for insufficient evidence "only when the evidence ... is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime." *Verde,* 770 P.2d at 124; *State v. Petree,* 659 P.2d 443, 444 (Utah 1983). Specific to robbery, we have stated:

[T]he jury can find not only the facts shown directly by the evidence, but also such additional facts as may reasonably be inferred therefrom. Thus, the intent to commit the crime of robbery ... may be found from proof of facts from which it reasonably could be believed that such was the defendant's intent.

*State v. Kazda,* 15 Utah 2d 313, 392 P.2d 486, 488 (1964).

Germonto argues that his robbery conviction was "unsupported by the evidence ... because the prosecution failed to establish all of the necessary elements" of that crime. Specifically, he contends that the State failed to present evidence establishing that Germonto took Mr. Lisonbee's ring and checkbook by force or fear. He also claims an absence of evidence indicating that he assaulted Mr. Lisonbee with the intent of taking his possessions. Furthermore, he asserts that the statutory requirements that possessions be taken from "the person or immediate presence" of another "against his will" "by means of force or fear" could not have been met because at the time he formed the intent to steal and committed the act, Mr. Lisonbee was already dead.

The State responds that Germonto has failed to marshal the evidence and establish why the jury verdict is not supported by the facts and reasonable inferences drawn therefrom. The State also addresses the merits of the sufficiency-of-the-evidence challenge. We agree with the State that the evidence was sufficient to support the conviction for robbery.

We consider this challenge in light of the statutory definition of robbery: "Robbery is the unlawful and intentional taking of personal property in the possession of another from his person, or immediate presence, against

his will, accomplished by means of force or fear." Utah Code Ann. § 76–6–301(1). We explained this provision in *State v. Smith*, 706 P.2d 1052 (Utah 1985):

> A robbery is committed when (a) personal property is taken from another person's possession, or is in the immediate presence of such other person at the time it is taken, (b) the property is taken contrary to the will of such other person, (c) the taking is accomplished by means of force or fear, (d) the taking is unlawful, and (e) the taking is intentional.

*Id.* at 1056. Applying *Smith*'s definition of robbery to the evidence presented at trial, a jury could reasonably have believed and concluded beyond a reasonable doubt that Germonto robbed Mr. Lisonbee under the statutory definition.

With respect to the first element, Germonto admits taking personal property in the form of a ring and a checkbook. He insists that he could not have taken anything from Mr. Lisonbee's possession or immediate presence because Mr. Lisonbee was already dead. However, the State presented medical evidence suggesting that Mr. Lisonbee could have remained alive for up to fifteen minutes following the attack. The jury could have accepted that testimony or, alternatively, rejected Germonto's version of events and concluded instead that he formed the intent to take the items before hitting Mr. Lisonbee or during the course of the altercation. Furthermore, to demonstrate that the items were on Mr. Lisonbee's person or in his presence, witnesses testified that Mr. Lisonbee always wore his diamond ring and was wearing it one hour before the attack took place; the medical examiner also confirmed that Mr. Lisonbee had a mark on his finger consistent with removal of the ring. Finally, the State offered testimony to suggest that Mr. Lisonbee's checkbook was either on his person or in his immediate presence at the time of the attack. In light of this evidence, reasonable jurors could properly have concluded that the first element of the robbery was proven.

■ Similarly, ample evidence demonstrates that the taking was against the victim's will. The State presented evidence that a violent struggle occurred in almost every room of the house. Germonto admits that he took the property only after Mr. Lisonbee was incapacitated. Also, the evidence indicating that the struggle may have begun immediately upon Germonto's entry could lead a jury to conclude that the taking was against Mr. Lisonbee's will. Whether the jurors believed Germonto's version of the events or the State's, they could have reasonably concluded that Germonto took the property against Mr. Lisonbee's will.

■ The same evidence also shows that the taking was accomplished through force or fear. For example, the State presented evidence that a vase normally kept by the front door was broken over Mr. Lisonbee's head. This and other evidence suggest that the struggle began when Germonto entered Mr. Lisonbee's home. Furthermore, Germonto admits that he applied force in hitting Mr. Lisonbee with the wrench an uncertain number of times, leaving Mr. Lisonbee unconscious or perhaps dead. The net result of Germonto's use of force was incapacitation of Mr. Lisonbee, which allowed Germonto to remove the items from Mr. Lisonbee's possession and accomplish the taking.

■ The above evidence further suggests the inherent unlawfulness of the taking. Germonto has never claimed that he came by the checkbook or the ring lawfully; even if the jury accepted Germonto's claim that he took the items simply to effectuate his escape, it could properly conclude that the taking was unlawful.

■ Finally, Germonto admits that the taking was intentional in that he took the items to facilitate his escape. Germonto challenges the State's contention that the intent to steal must have been formed at the time he applied the force to Mr. Lisonbee. The *Smith* elaboration of the statutory definition contains no explicit requirement that intent to steal be formed at the time force is exerted, and we decline the invitation to read such a requirement into the statute. However, were we to do so, we would remain persuaded that the evidence that the struggle began immediately on Germonto's arrival or shortly thereafter supports an inference that

he had the requisite intent at the time he hit Mr. Lisonbee.

Taken together, this evidence supports findings on which all of the elements of robbery can be sustained and, viewed in a light most favorable to the verdict, provides no basis upon which to reverse the jury verdict. On this evidence, a reasonable jury could properly conclude that Germonto robbed Mr. Lisonbee.

## JURY UNANIMITY ON SECOND DEGREE MURDER CHARGE

■ The trial court instructed the jury on four of the statutory variants of second degree murder but did not require jury unanimity on the particular variant relied on for conviction. A homicide is classified as second degree murder if the actor

(a) intentionally or knowingly causes the death of another;

(b) intending to cause serious bodily injury to another, he commits an act clearly dangerous to human life that causes the death of another;

(c) acting under circumstances evidencing a depraved indifference to human life, he engages in conduct which creates a grave risk of death to another and thereby causes the death of another; or

(d) while in the commission, attempted commission, or immediate flight from the commission or attempted commission of ... robbery ... causes the death of another person. ...

Utah Code Ann. § 76–5–203 (1990).[1] Germonto argues that by failing to instruct the jury on unanimity, the trial court deprived him of his right to a unanimous jury verdict guaranteed by article I, section 10 of the Utah Constitution.[2]

This court has never squarely addressed the issue of whether jury unanimity is required when the first four variants of second degree murder are charged. In *State v. Russell*, 733 P.2d 162 (Utah 1987), a majority of this court held that unanimity was not required for the first three variants. *Id.* at 167 (Howe, J., & Hall, C.J.); *id.* at 170 (Stewart, J., concurring); *id.* at 178 (Durham, J., concurring in the result). Because the defendant in *Russell* was charged with only the first three variants, we were not called upon to consider the applicability of the unanimity rule to the fourth, felony murder variant.

Like *Russell*, the instant case does not present the occasion to undertake such an analysis. As described above, Germonto was properly convicted of robbery by a unanimous jury. Robbery was the predicate felony underlying the second degree murder conviction. The second degree murder conviction was thus unanimous as a matter of law under the fourth variant; the fact that the evidence might also support a conviction under the other three variants is therefore ultimately irrelevant. *See, e.g., State v. Shaffer*, 725 P.2d 1301, 1307 (Utah 1986) (holding that where jury was necessarily unanimous on one alternative aggravating circumstance for first degree murder, constitutional adequacy of another alternative need not be addressed). Consequently, we hold that the second degree murder conviction was proper, and we do not decide whether jury unanimity is required when the first four variants of second degree murder are charged.[3]

## DUPLICITY

■ Germonto was charged in count II of the amended information with robbery or, in the alternative, burglary. He filed a pretrial motion to compel the State to elect between the charges, claiming that the alternative charges failed to provide adequate notice of the offenses and were inconsistent. The trial court denied the motion, reasoning that Ger-

---

1. In 1990, the legislature amended the second degree murder statute and added an additional variant. *See* Act of March 12, 1990, ch. 227, 1990 Utah Laws 1103 (codified at Utah Code Ann. § 76–5–203(1)(e) (Supp.1993)). This fifth variant is not applicable to the present case.

2. Article I, section 10 provides in relevant part, "In criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10.

3. Accordingly, we do not consider the claim that failure to object on this ground constituted ineffective assistance of counsel.

monto was fully apprised of the State's theory of prosecution and that the offenses were not mutually exclusive.

On appeal, Germonto challenges the denial of his motion to elect. He claims that the "duplicitous" charge violated his rights to due process and subjected him to double jeopardy. We begin by noting that he did not advance these grounds below, and this court is not bound to consider them for the first time on appeal. *State v. Brown,* 853 P.2d 851, 853 (Utah 1992). We will, however, consider plain error affecting the substantial rights of a party. In making the plain error determination, we consider whether the error should have been obvious to the trial court and whether it was harmful. *Id.* Under this standard, Germonto's challenges fail.

Duplicity is "the joinder of two or more distinct and separate offenses in a single count." *State v. Tillman,* 750 P.2d 546, 563 n. 51 (Utah 1987) (citing *United States v. UCO Oil Co.,* 546 F.2d 833, 835 (9th Cir. 1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977)). "One vice of duplicity is that a jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of a particular offense. This may conflict with a defendant's Sixth Amendment rights and may also prejudice a subsequent double jeopardy defense." *UCO Oil,* 546 F.2d at 835. In addition, Germonto cites *State v. Wilcox,* 808 P.2d 1028, 1031 (Utah 1991) (defendant must be sufficiently apprised of particulars of charge to adequately prepare defense), as demonstrating that such charges may deprive a defendant of notice of the specific allegations of the crime.

Duplicity need not be fatal to a prosecution. Because it is a rule of pleading rather than substance, it may be cured by such devices as election of charges, a bill of particulars, or jury instructions. 1 Charles A. Wright et al., *Federal Practice and Procedure* § 145 (2d ed. 1982); *see also United States v. Kearney,* 444 F.Supp. 1290, 1295 (S.D.N.Y.1978); *Carman v. State,* 658 P.2d

131, 139 (Alaska Ct.App.1983). Thus, in determining whether the trial court improperly denied the motion to elect and allowed the alternative charges to stand, we will look to see whether the error, if any, should have been obvious and whether it was cured procedurally and thereby rendered harmless. We hold that any error was harmless.

Assuming without deciding that the error should have been obvious, we nonetheless conclude that the denial of the motion to elect was harmless error because the jury instructions cured any resultant deficiencies. The trial court explicitly instructed the jurors to consider the robbery charge first and to consider the alternative burglary charge only if they did not reach a unanimous verdict of guilt on the robbery charge. Germonto raised no objections to these instructions.[4] He was convicted unanimously of robbery, and therefore, we must presume that the jury never reached the burglary charge.

As instructed, the jury could not have convicted Germonto of both offenses, nor could he have faced double jeopardy in a second independent trial on the burglary charge. Moreover, the fact that the charges were pleaded alternatively did not necessarily deprive him of adequate notice. Germonto was given the date and nature of the offenses and a probable cause statement outlining the facts substantiating the charges. Even if this notice was inadequate, Germonto nevertheless failed to invoke the procedural remedies at his disposal to cure the deficiency. *See Wilcox,* 808 P.2d at 1031–32. Therefore, our review of the record has not revealed an error harmful to Germonto's substantial rights.

### JOINDER OF FORGERY WITH OTHER CHARGES

Initially charged with forgery, Germonto was subsequently charged with murder and robbery, or alternatively burglary, in an amended information. The State moved to consolidate the informations on the grounds that the offenses arose out of a

---

**4.** Failure to object to the instruction alone might be fatal to this argument on appeal. Utah

R.Crim.P. 19(c).

single criminal episode, were closely related in time, and were accomplished for the same criminal objective. Germonto argued that the forgery did not occur during the same criminal episode as the robbery and the killing and that joinder was prejudicial. The trial court ordered the informations joined after concluding that the charged offenses were part of a single sequence of acts and that the evidence of the forgery was otherwise admissible under rule 404(b) of the Utah Rules of Evidence [5] because it supported Germonto's identification in the homicide case.

On appeal, Germonto argues that the joinder of the charges was improper under rule 9 of the Utah Rules of Criminal Procedure. However, we note that rule 9 did not become effective until July 1990. The motion to join at issue in this case was decided in December 1989 under Utah Code Ann. § 77-35-9.[6] Therefore, our analysis will proceed under section 77-35-9.[7]

▉ The granting of a motion to join offenses rests within the sound discretion of the trial court; we will not interfere with that discretion unless it is clearly shown to have been abused. *State v. McGrath,* 749 P.2d 631, 633 (Utah 1988) (citing *State v. Peterson,* 681 P.2d 1210, 1214 (Utah 1984)). Applying that standard, we find no abuse of discretion in this case.

Section 77-35-9 permitted joinder of two or more offenses that arose "out of a criminal episode as defined in Section 76-1-401." Utah Code Ann. § 77-35-9(a). Furthermore, the statute mandated an election of separate trials of separate counts if a defendant or the prosecution was likely to be prejudiced by joinder. *Id.* § 77-35-9(d). As defined in section 76-1-401, a single criminal episode refers to "all conduct which is closely related in time and is incident to an attempt or an accomplishment of a single criminal objective." *Id.* § 76-1-401.

In granting the motion to join the informations, the trial court found that the offenses were part of the same criminal episode. The record supports this finding. First, the forgery occurred almost immediately after the robbery and homicide and hence was closely related in time. The fact that Germonto spent some time making several attempts to cash the forged check does not destroy the temporal proximity of the forgery to the other crimes. Second, the record supports a finding that the offenses shared a single objective, namely, to obtain property of value from Mr. Lisonbee. Although Germonto suggests a different theory of the events in question, the jury, in finding him guilty of both robbery and forgery, apparently believed that his intent was to obtain property of value from Mr. Lisonbee. Moreover, because the second degree murder conviction is also predicated on a unanimous finding of guilt on the robbery charge, the murder, like the robbery and forgery, shares the same objective.

Of course, we recognize that the trial court granted the motion to join before the jury had occasion to deliberate on and resolve these questions. Nonetheless, just as the jury could have concluded that each of those

---

5. Rule 404(b) provides as follows:
 Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 We find no error in the trial court's conclusion that evidence of the forgery was otherwise admissible. That evidence could have been used to prove motive, identification, intent, or other elements described in the rule.

6. Both provisions have since been repealed and recodified at Utah Code Ann. § 77-8a-1 (Supp. 1992).

7. That section states in pertinent part:

(a) Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged arise out of a criminal episode as defined in Section 76-1-401....

....

(d) If it appears that a defendant or the prosecution is prejudiced by a joinder of offenses or defendants in an indictment or information, or by a joinder for trial together, the court shall order an election of separate trials of separate counts, or grant a severance of defendants, or provide such other relief as justice requires....

Utah Code Ann. § 77-35-9(a), (d) (repealed 1990).

offenses shared proximity in time and the same criminal objective, the trial court could have concluded as much in exercising its discretion. Indeed, the State's theory of the case posited a single objective throughout the whole episode, namely, to obtain things of value from Mr. Lisonbee, and it was not an abuse of discretion for the trial court to give credence to that theory in granting the motion to join.

We note that this result is consistent with our case law construing section 76–1–401. For example, in *State v. Cornish*, 571 P.2d 577 (Utah 1977) (per curiam), we rejected a defendant's claim that the charges of failure to stop at the command of a police officer and theft of an automobile should have been joined. Specifically, the defendant stole an automobile and one day later was followed by the police for a traffic violation. He failed to stop and led the police on a high-speed chase, after which he stopped the car and fled into a field. *Id.* at 577.

The defendant sought to prevent prosecution of the second offense after he was convicted of stealing the car. We concluded that the two offenses were distinct because they were separated in time by one full day and had separate objectives. *Id.* at 577–78. We also took care to avoid a rigid rule mandating joinder whenever a defendant commits a crime to avoid arrest for prior criminal activity, *id.* at 578; however, our failure to announce that such conduct always warrants joinder does not preclude us from concluding that under some circumstances, joinder may be proper.

Similarly, in *State v. Ireland*, 570 P.2d 1206 (Utah 1977), we rejected a defendant's attempt to join charges of aggravated robbery for taking a patrolman's revolver and aggravated kidnapping for abducting hitchhikers. The defendant picked up the hitchhikers, informed them that he had stolen a revolver from an officer, and gave them an opportunity to leave his car. They remained, and some sixty-five miles later when police began following him, he informed them that they were his hostages. We concluded that

the two crimes had distinct differences in time (that necessary to drive sixty-five miles), location (two different counties), and purpose. *Id.* at 1207. Here, however, the facts show closeness in time, location, and purpose, all of which support the trial court's decision to join the informations.

Germonto also relies on *State v. Gotfrey*, 598 P.2d 1325 (Utah 1979), to support his claim that joinder was improper. *Gotfrey* construed the meaning of Utah Code Ann. § 77–21–31 (repealed 1980)[8] and discussed its purpose:

> The purpose of [section 77–21–31] is to allow joinder of offenses and thus eliminate multiple prosecutions to conserve time and effort when justice can best be served thereby. But care must be taken that the statute is not misused to deprive an accused of a fair trial upon an offense by joining different offenses so that evidence concerning charges unrelated in time and nature, which would normally not be admissible upon a trial, could be admitted as to the multiple offenses in an effort to stigmatize the defendant and thus make it questionable that the jury would give a fair and dispassionate consideration to the evidence on the first charge.

598 P.2d at 1328 (citations omitted). The defendant in *Gotfrey* was accused of raping both of his stepdaughters on numerous occasions and of committing sodomy upon his stepson, offenses which we concluded were "not of such similarity in character and circumstances of commission that, considering fairness to the defendant, they should have been joined." *Id.* This court premised its holding on the fact that the two rape charges stemmed from incidents occurring several months apart with different victims and that the sodomy charge was a separate and distinct offense with different elements. *Id.* The facts in *Gotfrey* are quite different from those in the instant case, where the offenses occurred within a matter of hours, involved the same victim, and were both (under the State's theory) part of an effort to acquire Mr. Lisonbee's property.

Utah Code Ann. § 77–8a–1 (Supp.1992) now governs this area.

Nor is this case like *State v. McCumber,* 622 P.2d 353, 355 (Utah 1980), where the defendant was charged with one count of aggravated sexual assault, one count of aggravated burglary, and one count of attempted rape. The charges arose out of two incidents occurring one month apart which involved different victims. We concluded that joinder was improper because the offenses, while of a similar character, were not part of the same criminal transaction, nor were they sufficiently identical to suggest a common design or scheme. *Id.* at 356. Again, those facts are distinct from this case, where the offenses were similar in nature, design, and victim.

The record and our case law construing the pertinent statutes amply demonstrate that the trial court was correct in granting the motion to join the offenses. Absent a showing that the trial court abused its discretion in so doing, we affirm the granting of the motion to join the informations.

## INEFFECTIVE ASSISTANCE OF COUNSEL

 Germonto claims that his trial counsel rendered ineffective assistance in two ways: by failing to present the defense of voluntary intoxication and by failing to object to the State's references to communications between Germonto and his attorneys. We address each in turn.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984), the United States Supreme Court imposed a two-part burden on defendants attempting to prove ineffective assistance of counsel. We have adopted that test as follows:

> To prevail, a defendant must show, first, that his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judg-

ment and, second, that counsel's performance prejudiced the defendant.

*Bundy v. DeLand,* 763 P.2d 803, 805 (Utah 1988). Moreover, a defendant must meet both burdens to prevail on an ineffectiveness claim. *State v. Templin,* 805 P.2d 182, 186 (Utah 1990). We reiterate that we need not address both components if a defendant fails to meet his or her burden on either one. *Bundy,* 763 P.2d at 805–06.

Applying the deficiency prong of *Strickland* to Germonto's first claim, we hold that counsel's failure to introduce a voluntary intoxication defense did not constitute ineffective assistance of counsel. At trial, defense counsel raised a claim of self-defense, apparently predicated on a letter they received from Germonto approximately one week before trial in which he described a new version of the incident. The court granted a continuance based on the new information, characterized by the State as a "bombshell." Germonto testified at trial that he first apprised his attorneys of the self-defense claim just before trial after "meditation ... [with] the Lord." The self-defense theory used at trial apparently resulted directly from that communication with his attorneys.

 It may well be that Germonto had a viable voluntary intoxication defense, based on his testimony that he had taken some "weird speed." Nonetheless, the record suggests that trial counsel presented the defense that most closely conformed to the story Germonto told at trial—that he acted in self-defense—and we will not review that tactical decision simply because another attorney might have chosen to act differently. *State v. Jones,* 823 P.2d 1059, 1063 (Utah 1991). Moreover, it is unlikely that another attorney would have chosen a different strategy based on the version of the facts Germonto presented.[9] We will not deem ineffective a legitimate professional choice of strategies simply because that choice did not yield the desired outcome. *State v. Bullock,* 791 P.2d 155, 160 (Utah 1989), *cert. denied,* 497

---

9. Despite substitute counsel's assertion that the two defenses were not incompatible, we note that the voluntary intoxication defense could have undermined Germonto's self-defense claim because intoxication might arguably have impaired his ability to ascertain that self-defense was objectively necessary. That alone suggests that counsel was not ineffective for failing to present the voluntary intoxication theory.

U.S. 1024, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990). This is particularly so where that choice of strategy appears to have been dictated by Germonto's eleventh-hour revelation of a new defense.

■ Germonto's second claim of ineffective assistance fails under the prejudice prong of the *Strickland* test. He asserts that trial counsel was ineffective in failing to object to the prosecutor's line of questioning concerning his disclosure of the self-defense theory to his attorneys. According to Germonto, such questioning violated the attorney-client privilege. In addition, he contends that counsel should have objected to the prosecutor's suggestion in closing argument that Germonto fabricated the self-defense theory shortly before trial.

Even if we assume, without deciding, that the questioning [10] and closing arguments were improper and that defense counsel should have objected to them, Germonto's claims still fail under the prejudice prong of *Strickland*. To show prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *Templin*, 805 P.2d at 187.

Germonto has not done so. In returning verdicts of guilty on both the robbery and murder counts, the jury rejected his self-defense theory. As we have described above, there is ample evidence to support those verdicts and to support a version of the events that differs from what Germonto alleges to have occurred. Furthermore, Germonto has not shown how he was prejudiced by the allegation that he fabricated the self-defense theory. Indeed, claims of fabrication are common, and we have seen no evidence suggesting that in this instance the fabrication claim persuaded the jury to convict when

it was otherwise inclined to acquit. Nor is the requisite prejudice demonstrated by Germonto's disclosure on cross-examination that it was his attorneys to whom he revealed his self-defense theory on the eve of trial. Germonto has proffered no evidence showing that the jury's rejection of his theory was in any way premised on the timing of that disclosure, and we are unable to discern any resulting prejudice in light of the abundant evidence contradicting his version of the events of January 9. The simple fact is that the jury did not believe his story, and the timing and circumstances under which that story surfaced were unlikely to have influenced the jury's assessment of its truth. Absent anything beyond mere speculation, we reject the ineffectiveness claim for lack of prejudice.

## ALLEGATIONS OF PROSECUTORIAL MISCONDUCT

■ Germonto claims that the prosecutor engaged in prejudicial misconduct when questioning Germonto concerning his disclosure of the self-defense theory and when arguing in closing that the theory was fabricated. We considered this claim above in the context of ineffective assistance of counsel, concluding that even if counsel's failure to object was deficient, Germonto nonetheless failed to demonstrate the requisite prejudice.

We now consider the argument under the rubric of plain error. In *State v. Brown*, we reiterated the two requirements for plain error: The error must be obvious to the trial court and affect the substantial rights of the accused. 853 P.2d at 853. Applying that test to both the question on cross-examination and the closing argument, we hold that neither meets the requirements of the plain error test.

---

10. The failure to object also may have been a legitimate exercise of professional judgment. Invocation of the attorney-client privilege at this particular juncture in the trial, i.e., while Germonto was on the stand, might have suggested to the jury that he had something to hide. Germonto was asked only when he first told *anyone* that Mr. Lisonbee had come at him with a knife; he was not asked whom he told or under what circumstances. The question presented was innocuous on its face, and trial counsel may well have concluded that more harm would come from objecting and attempting to hide testimony from the jury than would result from allowing Germonto to answer. We emphasize, however, that our role is not to second-guess defense counsel's trial tactics; we comment only to note our impression that counsel's behavior was not as clearly mistaken as Germonto would have us conclude.

Turning first to the challenged question, we find that the trial court committed no obvious error in allowing the question. As we suggested earlier, the question merely explored the timing of Germonto's disclosure of his self-defense version of events. The prosecutor asked only, "When did you first tell *anybody* about this 'he-attacked-me-with-a-knife' part of the story?" (Emphasis added.) As formulated, the question did not invade the province of confidential attorney-client communications because it did not ask Germonto about communication with his attorneys. The prosecutor merely asked for the time at which Germonto first disclosed his self-defense version of events. Germonto volunteered the specific information that the disclosure was to his counsel in response to a more general question, which does not render the question improper. We are not prepared to hold that a prosecutor may not ask a general question of this type, nor are we willing to impose on trial courts the obligation to intervene and prevent a question of that type from being asked. We conclude that the trial court did not commit obvious error in allowing the question to stand. In addition, where Germonto has volunteered information of the type provided in his answer, we find no harm affecting his substantial rights.

■ In light of the voluntary nature of Germonto's disclosure of the facts of his exchange with his attorneys, we find no harm in the prosecutor's use of arguable inferences from that testimony in closing argument. As we noted earlier, it is not uncommon for opposing counsel to claim in summation that a party's theories were fabricated.

### DEFENSE–OF–HABITATION INSTRUCTION

■ Germonto next claims that the trial court erred in instructing the jury on the defense of habitation. His challenge takes two forms: that the instruction was not sup-

ported by the evidence and that the instruction impermissibly shifted the burden of proof. Only the former objection was raised at trial. Because the second objection was *not raised at trial, we will not consider it for the first time on appeal.*[11] Utah R.Crim.P. 19(c) (where a party fails to object to an instruction, we will consider error only to avoid "manifest injustice"); *State v. Brown,* 853 P.2d at 859 (applying plain error standard requiring an obvious error affecting substantial rights of accused).

Accordingly, we consider only the argument that the instruction was not supported by the evidence. In substance, the challenged instruction informed the jury that a person may use deadly force to defend his or her home where (1) another person enters by violence or stealth and the homeowner believes the entry is intended to effectuate an assault or other personal violence, or (2) the entry is for the purpose of committing a felony and force is necessary to prevent the felony. Germonto's objection at trial was that there was no evidentiary basis for the instruction. We disagree.

While the evidence does not support a forced entry, it does suggest that the struggle began as soon as Mr. Lisonbee opened the door to Germonto. The location of broken objects, the presence of blood in almost every area of the house, and the short duration of the entire incident (approximately thirty minutes) all support the following inferences: (1) Germonto gained entry into the home by assaulting Mr. Lisonbee when he opened the door to Germonto; (2) Germonto entered to rob Mr. Lisonbee; and (3) Mr. Lisonbee acted to prevent the commission of that felony. Germonto's own testimony also provides a solid evidentiary basis for the instruction. He testified that when he followed Mr. Lisonbee into the kitchen, he approached him while carrying a large wrench, an implicitly threatening action that could have suggested an intent to commit a felony. Likewise, the relevance of the instruction

---

11. We are also unpersuaded by the logic of the burden-shifting argument. Germonto argues that the instruction allowed the jury to infer that Mr. Lisonbee acted reasonably, which somehow reduced the State's burden to prove Germonto guilty beyond a reasonable doubt. However, permitting such an inference does not mean that the trial court required such an inference. Furthermore, Germonto has not described *how* the burden shifted, and we fail to see the point of the argument.

was supported by Germonto's self-defense theory.

 We conclude that the instruction was supported by the evidence. Accordingly, we find no error.[12]

## CONCLUSION

Having reviewed Germonto's claims and found no error, we affirm his convictions for second degree murder, robbery, and forgery.

HALL, C.J., HOWE, Associate C.J., and STEWART and ZIMMERMAN, JJ., concur.

---

12. We note that this application of the defense-of-habitation instruction was unusual in that it was offered to give context to the actions of a victim, not of a criminal defendant. Nonetheless, we find no harm in its application to these circumstances.