*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2017 UT 21**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*

*v.*

DAVID M. RUSHTON,
*Petitioner.*

No. 20150737
Filed April 7, 2017

On Certiorari to the Court of Appeals

Third District, Salt Lake
The Honorable Robin W. Reese
No. 111903029

Attorneys:

Sean D. Reyes, Att'y Gen., Marian Decker, Asst. Att'y Gen.,
Salt Lake City, for respondent

Joanna E. Landau, Salt Lake City, for petitioner

JUSTICE HIMONAS authored the opinion of the Court,
in which JUSTICE DURHAM and JUSTICE PEARCE joined.

ASSOCIATE CHIEF JUSTICE LEE filed an opinion concurring in the
judgment, in which CHIEF JUSTICE DURRANT joined.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶ 1     This case clarifies the interpretation of the phrase "single criminal objective" in the context of the mandatory joinder statute, UTAH CODE § 76-1-401, which prohibits the State from prosecuting a defendant in separate actions for "conduct [that] may establish separate offenses under a single criminal episode," *id.* § 76-1-402(2). A "single criminal episode" is defined as "all conduct which is closely related in

time and is incident to an attempt or an accomplishment of a *single criminal objective.*" *Id.* § 76-1-401 (emphasis added).

¶ 2    The Petitioner, David Rushton, argues that the State violated the mandatory joinder statute by prosecuting him from 2011 to 2012 for wage crimes after having prosecuted and convicted him in 2009 and 2010 for tax crimes. Interpreting the phrase "single criminal objective" broadly, Mr. Rushton asserts that the conduct underlying both prosecutions was part of a single criminal episode because it was "closely related in time and . . . incident to an attempt or an accomplishment of [the] single criminal objective" of misappropriation of money in his business setting. *Id.* Therefore, Mr. Rushton argues, the court of appeals erred when it affirmed the district court's denial of his motion to dismiss the wage crimes prosecution as barred by the mandatory joinder statute. He appealed that denial, and we granted certiorari to consider the merits of his position.

¶ 3    We affirm the decision of the court of appeals, albeit along a somewhat different line of reasoning. If we were to read the phrase "single criminal objective" as broadly as Mr. Rushton urges us to, the permissive joinder statute, Utah Code section 77-8a-1, would be rendered inoperative. Instead, we consider the totality of the circumstances that bear on whether conduct aims at a single criminal objective, focusing in particular on the location where the crimes were committed, the nature of the offenses (both the similarity in conduct and, as suggested by the concurrence, the extent to which one offense advances the accomplishment of another), whether the crimes involved different victims, and whether the defendant had the opportunity to deliberately engage in the next-in-time offense. We determine that Mr. Rushton's conduct did not have a single criminal objective and thus did not constitute a single criminal episode.[1] Therefore, the mandatory joinder statute did not require the State to charge the tax crimes and wage crimes in a single prosecution, and the court of appeals correctly concluded that dismissal of the wage case based on the mandatory joinder statute was not warranted.

---

[1] Because there was no single criminal objective, we need not and do not reach the issue regarding whether the conduct was "closely related in time." UTAH CODE § 76-1-401. The lack of a single criminal objective alone is dispositive of whether the conduct constituted a single criminal episode for purposes of the mandatory joinder statute.

## BACKGROUND

¶ 4    Mr. Rushton started Fooptube LLC, a computer programming and design company in 2005. A few years later, the Utah State Tax Commission began investigating him due to allegations that he had withheld personal and corporate taxes while serving as an owner and officer of Fooptube. On April 14, 2009, the State charged Mr. Rushton with six tax crimes committed between 2005 and 2008.[2] Mr. Rushton was arraigned for the tax crimes on December 14, 2009. In June 2010, pursuant to a plea agreement, Mr. Rushton pleaded guilty to counts five and six, and the remaining counts were dismissed.

¶ 5    In May 2009, several former Fooptube employees approached the prosecutor and informed him of the wage claims they had against Mr. Rushton. The State then launched an investigation into these crimes. During that investigation, the investigator was contacted by the Utah Labor Commission, which informed him that Mr. Rushton had failed to pay wages to approximately eighty-four former Fooptube employees between October 2008 and October 2009. By 2011, ninety-five employees had reported unpaid wages for services provided to Fooptube. The claims for unpaid wages totaled $1,170,164.07. The investigator also learned that the United States Department of Labor's Employee Benefits Security Administration was investigating allegations that Mr. Rushton had failed to remit Fooptube employees' contributions to retirement funds in the amount of $107,000.00.

¶ 6    On April 20, 2011, the State filed the wage case against Mr. Rushton, charging him with seven second-degree felonies. The State amended its charges against Mr. Rushton on November 3, 2011, to include thirteen charges of class A misdemeanors as possible

---

2 The State charged Mr. Rushton with failing to file Fooptube's quarterly tax returns for 2007 and the first two quarters of 2008 (count 1); co-mingling funds or creating false documents with the intent to evade tax withholding obligations for 2007 through 2008 (count 2); failing to remit employee taxes for 2007 and the first two quarters of 2008 (count 3); issuing fraudulent W-2 forms and withholding tax statements from employees in 2008 (count 4); failing to "file personal income tax returns for the tax year(s) 2005, 2006 and/or 2007" (count 5); and, based on the foregoing predicate offenses, engaging in a pattern of unlawful activity in violation of Utah Code section 76-10-1603 (count 6).

alternatives to two of the previously charged felonies.[3] Mr. Rushton moved to dismiss the wage case, arguing that under the mandatory joinder statute, his wage crimes and tax crimes were part of a single criminal episode, and that because the tax case had already resulted in a conviction when he entered his guilty plea, he could not be prosecuted for the wage crimes.

¶ 7    The district court concluded that the conduct at issue in the tax case and in the wage case did not constitute a single criminal episode under the mandatory joinder statute. While the district court found that Mr. Rushton's conduct at issue in both cases was closely related in time, it concluded that the conduct at issue in the tax case was not committed in furtherance of the same criminal objective as the conduct at issue in the wage case. According to the district court, although the cases are factually similar, they involve different victims, issues, laws, and jury instructions. As a result, the district court held that the conduct did not constitute a single criminal episode.

¶ 8    After the court denied Mr. Rushton's motion to dismiss, Mr. Rushton entered a conditional guilty plea to count 3 (amended to a third-degree felony of attempted unlawful dealing with property), count 7, and count 20. Mr. Rushton then appealed the district court's decision, and the court of appeals affirmed the district court's ruling, holding that Mr. Rushton's tax crimes and his wage crimes did not constitute a single criminal episode under the mandatory joinder statute. *State v. Rushton*, 2015 UT App 170, ¶¶ 5–6, 354 P.3d 223. Mr. Rushton then petitioned for a writ of certiorari asking that we review the court of appeals' decision against him. We granted the writ and, therefore, exercise jurisdiction under Utah Code section 78A-3-102(3)(a).

---

[3] The State charged Mr. Rushton with the following twenty counts, all of which are allegedly related to Fooptube employee compensation or retirement arrangements and based on conduct that took place in 2008 or 2009: communications fraud (counts 1 and 2); unlawful dealing of property by a fiduciary (counts 3 and 4); theft of services (counts 5 and 6); failure to pay wages (counts 7 through 19, as alternatives to counts 5 and 6); and engaging in a pattern of unlawful activity, in violation of Utah Code section 76-10-1603 (count 20).

**STANDARDS OF REVIEW**

¶ 9 "On certiorari, we review the court of appeals' decision for correctness, focusing on whether that court correctly reviewed the trial court's decision under the appropriate standard of review." *Hansen v. Eyre,* 2005 UT 29, ¶ 8, 116 P.3d 290 (internal quotation marks omitted). A trial court's denial of a motion to dismiss presents a question of law, which is also reviewed for correctness. *See State v. Arave*, 2011 UT 84, ¶ 25, 268 P.3d 163.

**ANALYSIS**

¶ 10 We affirm the court of appeals' denial of Mr. Rushton's motion to dismiss. In so doing, we clarify the interpretation of the phrase "single criminal objective" in the context of the mandatory joinder statute. Under the mandatory joinder statute, the State is prohibited from prosecuting a defendant in separate actions for conduct that "is closely related in time and is incident to an attempt or an accomplishment of a single criminal objective." UTAH CODE § 76-1-401, 402(2).[4]

¶ 11 When we tackle questions of statutory construction, our overarching goal is to implement the intent of the legislature. *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 ("It is well settled that when faced with a question of statutory interpretation, 'our primary goal is to evince the true intent and purpose of the Legislature.'" (citation omitted)). Our first undertaking in this regard is to assess the language and structure of the statute. *Id.* ("The best evidence of the legislature's intent is 'the plain language of the statute itself.'" (citation omitted)); *In re Reinhart*, 2012 UT 82, ¶ 17, 291 P.3d 228 (reviewing a "statute's plain language and structure"). "Often, statutory text may not be plain when read in isolation, but may become so in light of its linguistic, structural, and statutory context." *Id.* The reverse is equally true: words or phrases may appear unambiguous

---

[4] For the mandatory joinder statute to operate as a bar, the offenses must also be "within the jurisdiction of a single court . . . and . . . known to the prosecuting attorney at the time the defendant is arraigned on the first information or indictment." UTAH CODE § 76-1-402(2). In addition, the trial court retains the authority to order separate trials "to promote justice." *Id.* These circumstances are not at issue here and we therefore do not discuss them further.

when read in isolation, but become ambiguous when read in context. This is why

> we read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters[,] . . . avoid[ing] any interpretation which renders parts or words in a statute inoperative or superfluous in order to give effect to every word in the statute.

*Monarrez v. Utah Dep't of Transp.*, 2016 UT 10, ¶ 11, 368 P.3d 846 (internal quotation marks omitted). Indeed, "it is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.'" *Reno v. Koray*, 515 U.S. 50, 56 (1995) (citation omitted). This is why we look to context when, as here, "both sides offer conceivable constructions of the language in question." *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465.

¶ 12 With this legal backdrop in mind, we turn first to Mr. Rushton's argument that the phrase "single criminal objective" is broad enough to encompass an objective as broad as misappropriation of any money he had power over through Fooptube. We conclude that such a broad interpretation of the phrase "single criminal objective" would render the permissive joinder statute inoperative, which would violate our principles of statutory interpretation. Rather, we consider the totality of the circumstances, focusing in particular on the location where the crimes were committed, the nature of the offenses, whether the crimes involved different victims, and whether the defendant had the opportunity to deliberately engage in the next-in-time offense. Based on our analysis of those factors, we determine that Mr. Rushton's conduct at issue in the tax case and in the wage case did not have a single criminal objective and thus was not part of a single criminal episode mandating joinder of the charges against him in a single prosecution.

## I. MR. RUSHTON'S INTERPRETATION OF SINGLE CRIMINAL OBJECTIVE

¶ 13 Mr. Rushton argues that under a plain language analysis "single criminal objective" means all conduct that is "connected by a single criminal purpose, goal, or target[] that the defendant's conduct is intended to attain." He further argues that misappropriating "money in

the context of Fooptube," no matter how or from whom, satisfies this definition.

¶ 14 We reject Mr. Rushton's claim that his misappropriation qualifies as a single criminal objective for purposes of the mandatory joinder statute. Under our plain language principles of statutory construction, it is necessary to consider both the permissive joinder statute and the mandatory joinder statute when interpreting the phrase "single criminal objective." We conclude that Mr. Rushton's characterization of his behavior as a single criminal objective of misappropriation is too broad and would render the permissive joinder statute inoperative.

¶ 15 As the State correctly points out, when interpreting the phrase "single criminal objective," we must consider both the permissive joinder statute and the mandatory joinder statute in order to ensure that our interpretation does not render the permissive joinder statute inoperative. *See State, in re J.M.S.*, 2011 UT 75, ¶ 22, 280 P.3d 410 (stating that we interpret statutory provisions "in harmony with other statutes in the same and related chapters" (citation omitted)).

¶ 16 The relevant statutory provisions are as follows: The permissive joinder statute states that offenses "may be charged in the same indictment or information" if the offenses are "based on the same conduct or are otherwise connected together in their commission . . . or . . . alleged to have been part of a common scheme or plan." UTAH CODE § 77-8a-1(1). The mandatory joinder statute states that "[w]henever conduct may establish separate offenses under a single criminal episode . . . a defendant shall not be subject to separate trials for multiple offenses." *Id.* § 76-1-402(2). The phrase "single criminal episode" in the mandatory joinder statute is statutorily defined as "all conduct which is closely related in time and is incident to an attempt or an accomplishment of a single criminal objective." *Id.* § 76-1-401. Based on our principles of statutory construction, we cannot interpret the language "single criminal objective" under the mandatory joinder statute to simply mean the same thing as conduct that is "connected together [with other conduct] in its commission" or "alleged to have been part of a common scheme or plan" under the permissive joinder statute. *Id.* § 77-8a-1(1); *see also State v. Martinez*, 2002 UT 80, ¶ 8, 52 P.3d 1276 ("When examining the statutory language . . . . we avoid interpretations that will render portions of a statute superfluous or inoperative." (internal quotation marks omitted)).

¶ 17 Mr. Rushton's characterization of misappropriation as his single criminal objective conflates offenses that are "connected together in their commission" or are "part of a common scheme or plan" with offenses that are "closely related in time" and have a "single criminal objective." UTAH CODE §§ 76-1-401, 77-8a-1(1). For example,[5] if we were to apply Mr. Rushton's interpretation of misappropriation as a single criminal objective[6] to a situation where a bank robber robs multiple banks in a single day, the State would be required to join all the bank robbery charges in a single prosecution. Joinder would be mandatory despite the crimes having been committed in different locations, despite the crimes involving different victims, despite none of the crimes having been committed in order to advance the accomplishment of any of the others, and despite the robber likely having the opportunity to make conscious and knowing decisions between the commission of each of the different robberies—all of which are factors in the single criminal objective analysis we lay out below. In the case at hand, "the facts adequately support the trial court's determination that . . . separate and distinct offenses were committed. To adopt [Mr. Rushton's] interpretation of the statute would serve only to torture its clear wording to afford him the advantage of a single . . . conviction." *State v. Ireland*, 570 P.2d 1206, 1207 (Utah 1977).[7] Thus, we

---

[5] For the purposes of this hypothetical example, we assume that the offenses meet the "closely related in time" factor, another necessary component for concluding that conduct was part of a single criminal episode. *See* UTAH CODE § 76-1-401.

[6] Mr. Rushton quotes the definition of "misappropriation" from *Black's Law Dictionary* as "[t]he application of another's property or money dishonestly to one's own use." Alternatively, he states that misappropriation is "steal[ing] money to which [a person] was not entitled."

[7] *See also People v. Perez*, 591 P.2d 63, 68 (Cal. 1979) (en banc) ("Assertion of a sole intent and objective to achieve sexual gratification is akin to an assertion of a desire for wealth as the sole intent and objective in committing a series of separate thefts. To accept such a broad, overriding intent and objective to preclude punishment for otherwise clearly separate offenses would violate the statute's purpose to insure that a defendant's punishment will be commensurate with his culpability. It would reward the defendant who has the greater

(cont.)

cannot read the phrase "single criminal objective" under the mandatory joinder statute so broadly without rendering the permissive joinder statute inoperative.

¶ 18 In addition, we reject the following arguments Mr. Rushton makes about the interpretation of statutes, and, in particular, the interpretation of the mandatory joinder statute. First, Mr. Rushton argues that interpreting statutes "in harmony with other statutes in the same chapter and related chapters" is a secondary rule of statutory interpretation, rather than part of a court's plain language interpretation. *State v. Harker*, 2010 UT 56, ¶ 12, 240 P.3d 780 (citation omitted). As a result, he argues, since "the state has not suggested any debate about the plain meaning of the language," we do not need to rely on "other interpretative tools," like the so-called secondary rule of interpreting statutes in harmony with related chapters. We strongly disagree with Mr. Rushton on this point. Interpreting a statute "in harmony with other statutes in the same chapter and related chapters" is part of our plain language analysis. *See id.* ("[W]e read the plain language of [a] statute as a whole and interpret its provisions in harmony with other statutes in the same chapter and related chapters." (second alteration in original) (citation omitted)). Consequently, reading the "single criminal objective" language under the mandatory joinder statute in harmony with the permissive joinder statute constitutes a plain language interpretation of the mandatory joinder statute.

¶ 19 Mr. Rushton also argues that the permissive joinder statute is not a related chapter to the mandatory joinder statute. Therefore, he argues, the mandatory joinder statute does not need to be read in harmony with the permissive joinder statute. He bases this argument on the fact that the mandatory joinder statute, which is found under title 76, is not under the same title as the permissive joinder statute, which is found under title 77. We reject this argument. There is no requirement that related chapters, which must be interpreted in harmony with one another, be found under the same title of the Utah

criminal ambition with a lesser punishment." (citation omitted)); *State v. Bauer*, 792 N.W.2d 825, 830 (Minn. 2011) ("Our case law recognizes that 'the criminal plan of obtaining as much money as possible is too broad an objective to constitute a single criminal goal . . . .'" (citation omitted)).

Code. Mr. Rushton himself points out nine different statutes in the Utah Code that use the same definition of single criminal episode, many of which are found under different titles. Using his logic, we would have to declare those statutes that use the same definition of single criminal episode not related. This would be a real stretch. As a result, we conclude that even though the mandatory and permissive joinder statutes "do not share a common statutory title," they are related chapters and must be interpreted in harmony with one another.

¶ 20 Finally, we disagree with Mr. Rushton's assertion that the legislature wanted us to interpret the mandatory and permissive joinder statutes separately or in isolation from one another. We read the language in Utah Code section 76-1-401 that "[n]othing in this part shall be construed to limit or modify the effect of Section 77-8a-1" differently than Mr. Rushton. He reads this language as prohibiting a narrow interpretation of the mandatory joinder statute. We, on the other hand, read this language to support our conclusion that we may not read the mandatory joinder statute so broadly as to render the permissive joinder statute inoperative. We may not construe or limit the effect of the permissive joinder statute, rendering it a nullity, by interpreting the "single criminal objective" language as broadly as Mr. Rushton wishes us to do. As a result, we reject the idea that Utah Code section 76-1-401 somehow prevents us from considering the permissive joinder statute in our plain language analysis of what "single criminal objective" means under the mandatory joinder statute.

¶ 21 We must interpret the mandatory joinder statute in harmony with the permissive joinder statute. Using a plain language analysis, we determine that Mr. Rushton's interpretation of single criminal objective is overly broad and would render the permissive joinder statute inoperative. This result is contrary to our rules of statutory interpretation and thus we reject Mr. Rushton's characterization of his single criminal objective.

## II. THE CONCURRENCE'S INTERPRETATION OF THE MANDATORY JOINDER STATUTE

¶ 22 We also disagree with the interpretation of "incident to an attempt or accomplishment of a single criminal objective" proffered by the concurring opinion. The concurrence equates a "single criminal episode" with a single "crime." *Infra* ¶ 59. The concurrence accordingly reads this language to cover only conduct that is "directly and immediately relat[ed] to . . . an attempt or accomplishment" of another

offense. *Infra* ¶ 62. The concurrence prefers its interpretation to a totality of the circumstances test for two reasons: (1) because it better respects the "operative language" of the statutory text and (2) because it is more predictable than a test requiring a district court to weigh multiple factors in deciding whether joinder is required. *Infra* ¶¶ 48–49. We disagree.

¶ 23  First, we do not believe that the concurrence's test comports with the plain meaning of the statutory text. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 12, 248 P.3d 465 (in interpreting the plain meaning of statutory text "[o]ur task . . . is to determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)" (citation omitted)). In interpreting statutes, "[w]e presume the Legislature uses each word advisedly." *Meza v. State*, 2015 UT 70, ¶ 18, 359 P.3d 592. Thus, we presume that if the legislature had intended the reading that the concurrence prefers, it would have defined a "single criminal episode" as "all conduct which is . . . incident to an attempt or an accomplishment of a single *offense*" — using a term that it specifically defined in the Utah Criminal Code. *Cf.* UTAH CODE § 76-1-601(7) ("'Offense' means a violation of any penal statute of this state."). Instead, the legislature used the term "single criminal objective" — a term that connotes the *goal* or *purpose* of the offender's criminal conduct, not merely another offense.[8] *Id.* § 76-1-401.

¶ 24  We are also doubtful that the concurrence's proposed test is any more predictable than the totality of the circumstances test that we

---

[8] The concurrence maintains that we "misstate[] [its] standard" because, on its interpretation of the mandatory joinder statute, "[t]he use of the term 'objective' has significance that is not as clearly conveyed by the term 'offense.'" *Infra* ¶ 53 n.1. Specifically, the word is supposed to convey that "[t]he conduct at issue must be incident to the acts undertaken in attempting or accomplishing the relevant 'objective' crime." *Id.* We fail to see how the phrase "the relevant 'objective' crime" is meaningfully different, or any different, from the term "offense." Indeed, the concurrence appears to agree with us, noting elsewhere that, under its test, "[e]ither of two crimes could be the 'objective.'" *Infra* ¶ 61 n.8. In any event, the plain meaning of a "single criminal objective" connotes a criminal aim or purpose that is broader than a single criminal offense.

adopt—indeed, it may well be less predictable. The concurrence would have courts focus on whether one offense was "incident" to another, where "incident" is defined as "dependent on or appertaining to another thing: directly and immediately relating to or involved in something else though not an essential part of it." *Infra* ¶ 60 n.6. But consider, for example, how this test would apply to a case where a defendant writes a computer program that in quick succession steals $30,000 from ten separate accounts belonging to ten separate clients of the same bank.

¶ 25 To make the hypothetical even more vivid, imagine that this defendant keeps a diary in which he specifically states that his objective was to steal $30,000 in small enough increments that (in his view) they were less likely to immediately trigger the bank's anti-fraud measures and more likely to go undetected.

¶ 26 This should be an easy case. The state should not be allowed to bring serial prosecutions against a bank robber who has written a single computer program to steal from multiple bank accounts, and who admittedly has a single criminal purpose underlying each almost identical crime. (This example is not farfetched, and it can be multiplied. Imagine a hacker who simultaneously acquires unauthorized access to one million computers. The concurrence's logic would in theory allow one million trials. We would not.)

¶ 27 But under the concurrence's test it is not easy to predict whether each act of theft need be joined in the same trial. On the one hand, each act is a "choate crime" and each is logically independent of the other. This militates in favor of finding that each act need not be joined under the mandatory joinder statute. And the concurrence appears to believe that, under its test, the separate crimes need not be joined. *See infra* ¶¶ 67–69. But this is not obvious from the language of the concurrence's test. Instead, it is arguable that each act of theft was "directly and immediately relat[ed]" to the others (though not "essential" to them); after all, the bank robber admitted as much. Or imagine that the evidence conclusively shows (or the indictment pleads) that the bank robber pursued any of the individual robberies only because he could pursue them *all* simultaneously (perhaps because if he had not been able to pursue them all he would have decided that the reward was not worth the risk). Under this hypothetical, it seems perfectly possible for a reasonable court to conclude that each robbery was not only "directly and immediately relat[ed]" to the others, but, arguably, even "depend[ent]" on them, too.

*Infra* ¶ 60 n.6. But it is equally possible for a reasonable court applying the concurrence's test to conclude that the robberies still were not "incident to" each other.

¶ 28 This is doubly troubling. As we have explained, the bank-robber hypothetical should be an easy case. But the concurrence's test is challenged by it. Even worse, its outcome is unpredictable. And this unpredictability is not just going to arise at the periphery; it is a core feature of a test that requires a court to assess the degree to which one offense is "relat[ed]" to another. As a practical matter, we cannot see how courts can do this without ultimately considering a variety of factors that bear on the tightness of the nexus between the offenses. The ironic upshot, then, is that in seeking to promote predictability by eschewing a multi-factor test, the concurrence has articulated a standard that courts cannot implement without considering a multiplicity of factors—but, unlike the majority, the concurrence leaves courts without any guidance on what those factors should be.

¶ 29 The concurrence also faults our test for yielding "problematic results" in a solicitation case. It offers as an example "a bank robbery preceded by solicitation of an accomplice," and it suggests that the totality of the circumstances test that we adopt might not require joinder of the solicitation and the bank robbery if, for example, the defendant and accomplice reside in different states. For then "the offenses could be said to arise in a 'different geographic location[],' . . . the solicitation offense is 'substantively different' in 'nature' from bank robbery, . . . and the defendant," we may imagine, "had 'the opportunity to make a conscious and knowing decision to engage in the next-in-time offense.'" *Infra* ¶ 65.

¶ 30 We are not as troubled by the possibility that the mandatory joinder statute might not require the solicitation to be joined with the bank robbery in this case, although we think that in many cases it will—especially given that, absent significant differences in the evidence that a prosecutor would otherwise introduce, a solicitation will often be similar in nature, and bound up with, the crime being solicited.

¶ 31 Moreover, it is not clear that the concurrence's proposed test fares particularly well under this example either. Consider a variant on the concurrence's solicitation example. A would-be bank robber draws up plans to rob a bank, which include the assistance of an accomplice. He solicits one of his friends to help him. Then, after further thought,

the bank robber decides he will go it alone. He dismisses his friend and replans the bank robbery as a one-man job. Was the solicitation "incident to" the bank robbery under the concurrence's test? Not obviously. It is far from clear that the solicitation "directly and immediately relat[ed] to" the bank robbery; after all, the bank robber changed his plans after the solicitation and decided to pursue the bank robbery alone. This is yet another example where the concurrence's test fails to live up to its promise of predictability.

¶ 32  A final problem with the concurrence's reading is that, in circumstances where it does clearly yield a single outcome, it reaches the wrong result. Consider this example:

> Defendant was stopped by a highway patrolman in Beaver County for speeding. He pulled a gun, threatened the patrolman, relieved him of his revolver, locked him in the trunk of the patrol vehicle, shot holes in its two front tires, and left the scene in his own vehicle. He subsequently picked up two hitchhikers, showed them the revolver, and advised them of his having taken it from the patrolman. He further advised them that they need not stay in the car with him.

> Defendant proceeded on to the adjoining County of Sevier, stopped to purchase fuel, and shortly thereafter police began following him at which time he informed the hitchhikers they were his hostages and held a gun on them. He was ultimately apprehended at a roadblock, tried and convicted in Sevier County for aggravated kidnapping of the hitchhikers, and was subsequently convicted in Beaver County of this offense of aggravated robbery for the taking of the patrolman's revolver.

*State v. Ireland*, 570 P.2d 1206, 1206 (Utah 1977).

¶ 33  Under the concurrence's logic, the aggravated kidnapping was plainly incident to the objective of successfully accomplishing the aggravated robbery and, therefore, the mandatory joinder statute required that the two offenses be joined. Yet we rightly held otherwise. *Id.* at 1207 ("In this case there was a distinct difference in time [and] location . . . and the criminal objective of robbery was entirely different than that of kidnapping which was totally disconnected in time, place or purpose."); *see State v. Germonto*, 868 P.2d 50, 60 (Utah 1993) ("We . . . [take] care to avoid a rigid rule mandating joinder whenever a

defendant commits a crime to avoid arrest for prior criminal activity . . ." (citation omitted)); *State v. Cornish*, 571 P.2d 577, 578 (Utah 1977) (per curiam) (declining to hold that a failure to stop and an automobile theft were part of a single criminal episode because "[t]o treat them as a single criminal episode would mean that any crime a defendant commits to avoid arrest for prior criminal activity would be part of the same criminal episode").

¶ 34 As we explain below, we believe there is a place for the concurrence's test in the mandatory joinder analysis. But, for the foregoing reasons, we do not believe it should be the exclusive focus.

## III. TOTALITY OF THE CIRCUMSTANCES

¶ 35 We have concluded that neither Mr. Rushton's nor the concurrence's interpretation respects the plain language of the joinder statutes. Mr. Rushton's assertion that "single criminal objective" is so broad as to encompass the objective of misappropriation does violence to the statutory scheme by rendering the permissive joinder statute inoperative, and the concurrence's contention that a "single criminal objective" is nothing more than a criminal "offense" assumes that the legislature chose to use a term it has not defined to mean a term it specifically defined in the criminal code. We therefore consider the totality of the circumstances, focusing on factors from our case law,[9] to determine whether Mr. Rushton's conduct at issue in the tax case and in the wage case had a single criminal objective.[10] *See State v. Selzer*,

---

[9] Many of the cases that we cite in the following footnotes discuss a previous version of our mandatory joinder statute. UTAH CODE § 76-1-402 (1978). That statute used the same statutory definition of single criminal episode as the current mandatory joinder statute, including the "single criminal objective" language. *See* UTAH CODE § 76-1-401.

[10] The concurrence faults us for failing "to connect [our] multi-factored test with the language of the statute." *Infra* ¶ 53 n.1. It is true that our test does not merely mirror the language of the statute. But it is nonetheless more faithful to the text and structure of the statute than the alternatives; it harmonizes the structure of the mandatory and permissive joinder statutes without assuming that the legislature chose to use a unique phrase to mean the same thing as a single term that it had already defined. And it is faithful to longstanding precedent in a way the concurrence's test is not. *See, e.g.*, *supra* ¶¶ 32–33.

(cont.)

2013 UT App 3, ¶ 26, 294 P.3d 617 ("Whether or not there is a single criminal objective depends on the specific facts of the case viewed under . . . the totality of the circumstances." (alteration in original) (internal quotation marks omitted)). In making this determination, we consider, among other things, the location where the crimes were committed, the nature of the offenses (both the similarity in conduct and the extent to which one offense advances the accomplishment of another), whether the crimes involved different victims, and whether the defendant had the opportunity to deliberately engage in the next-in-time offense.[11] While they are certainly not the only factors relevant to the mandatory joinder analysis, these factors are well-suited to

---

The concurrence also worries that the test we announce today will be misapplied in the same way as the test this court announced in *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988), where we identified factors courts should consider in evaluating the admissibility of evidence under rule 403 of the Utah Rules of Evidence. *Infra* ¶ 53 n.2. But the problem with the test we announced in *Shickles* is that it was partially inconsistent with the language of rule 403 and purported to replace rule 403's own balancing test with a different test. By contrast, the test we announce today is not inconsistent with the mandatory joinder statute nor does it replace a statutory test with another test of our own making. Instead, it gives the trial courts guidance on how to determine whether two offenses are "incident to an attempt or an accomplishment of a single criminal objective." UTAH CODE § 76-1-401.

[11] Other jurisdictions also consider these same factors in confronting similar issues. *See, e.g., State v. Bauer*, 792 N.W.2d 825, 828 (Minn. 2011) (considering the "different locations" of the crimes in determining whether conduct constituted a single behavioral incident); *State v. Condo*, 182 P.3d 57, 61 (Mont. 2008) (considering the substantive nature of a negligent vehicular homicide charge and a DUI charge in determining the crimes "[did] not share the same purpose, motivation, and criminal objective"); *State v. Stevens*, 900 N.E.2d 1037, 1040–41 (Ohio Ct. App. 2008) (considering the presence of "multiple victims" in determining whether a robbery of several people in a single home constituted a single objective); *State v. Nguyen*, 771 P.2d 279, 281 (Or. Ct. App. 1989) (rejecting the argument that a defendant's acts constituted a single criminal episode because "[a]lthough the charges were identical, they did not arise from 'continuous and uninterrupted' conduct").

advancing the twin purposes of the mandatory joinder statute: "(1) to protect a defendant from the governmental harassment of being subjected to successive trials for offenses stemming from the same criminal episode; and (2) to ensure finality without unduly burdening the judicial process by repetitious litigation." *Selzer*, 2013 UT App 3, ¶ 22 (citation omitted). Applying our totality of the circumstances test, we conclude that Mr. Rushton's conduct did not have a single criminal objective and we therefore affirm the court of appeals' decision.

¶ 36   First, we consider "whether the offenses arose in different geographic locations." *United States v. Letterlough*, 63 F.3d 332, 335 (4th Cir. 1995).[12] Unfortunately, there is insufficient evidence in the record to determine where Mr. Rushton's tax crimes and wage crimes occurred. Mr. Rushton's conduct may have occurred within the four walls of the business or where the payments were due. Regardless, this factor is not dispositive. Courts in other jurisdictions have found offenses to constitute separate offenses based on the defendant's having had time between the offenses and the opportunity to make a conscious, knowing decision to commit each offense, despite the offenses having been committed in the same location. *See, e.g., United States v. Thomas*, 381 F. App'x 495, 505–08 (6th Cir. 2010). We agree. So even if we assume that Mr. Rushton committed both his tax crimes and his wage crimes at the same location, that factor is not dispositive. Therefore, we turn to the other factors to make our ultimate decision.

¶ 37   Second, we consider "whether the nature of the offenses was substantively different." *Letterlough*, 63 F.3d at 335–36.[13] The tax crimes

---

[12] *See, e.g., State v. Ireland,* 570 P.2d 1206, 1207 (Utah 1977) ("In this case there was a distinct difference in . . . location, (two separate counties) and the . . . kidnapping . . . was totally disconnected in . . . place.").

[13] *See, e.g., State v. Germonto,* 868 P.2d 50, 60–61 (Utah 1993) (holding that "the offenses [of murder, robbery, and forgery] were similar in nature [and] design" as "part of an effort to acquire [the victim's] property"); *State v. McGrath,* 749 P.2d 631, 633 (Utah 1988) (noting a "similarity of the offenses charged" and concluding joinder was proper); *Hupp v. Johnson*, 606 P.2d 253, 254 (Utah 1980) (holding that the "separate, independent offenses . . . were entirely unrelated to each other" and thus "were not committed to accomplish a 'single criminal objective'"); *State v. Cornish*, 571 P.2d 577, 578 (Utah 1977) (concluding

(cont.)

and the wage crimes were plainly different in nature. Each set of offenses involved different financial concepts and bodies of proof. For example, the tax offenses involved issues such as whether Mr. Rushton had improperly "co-mingle[d] funds," whether he had prepared fraudulent tax returns, and whether he failed to file his personal income taxes. By contrast, the wage offenses involved whether Mr. Rushton had kept wages and retirement benefits he owed to his employees for himself. Similarly, Mr. Rushton's tax crime charges arose out of an investigation by the Utah State Tax Commission, and Mr. Rushton's wage crimes were independently under investigation by the Utah Labor Commission and the United States Department of Labor. Moreover, the prosecutor in Mr. Rushton's tax case was apparently unaware of the wage crimes until after Mr. Rushton pleaded guilty to the tax offenses. And while there was some overlap in the statutes under which Mr. Rushton was charged in the wage and tax cases, the same statute may cover substantively different kinds of conduct.[14] For example, in *State v. Gibson*, 2009 UT App 108, 208 P.3d 543 and *State v. Winward*, 907 P.2d 1188 (Utah Ct. App. 1995), the defendants were both charged under Utah Code section 76-6-513, but their conduct was very different. In *Gibson*, the defendant was charged for opening fraudulent credit card accounts in her grandmother's name, 2009 UT App 108, ¶ 2, while in *Winward*, the defendant was charged for writing a fraudulent offer on a home, 907 P.2d at 1189–90. Thus, the fact that two charges are based on a single statute is not necessarily indicative of conduct of a similar nature. Given such differences in conduct, we are not troubled by the minor overlap in the statutory charges between the cases and do not see it as evidence of

---

that "although the testimony given may overlap, the offenses are different and . . . distinct" and that "the proof requirements are different"); *Ireland*, 570 P.2d at 1207 (holding that "[the] robbery was entirely different than . . . [the] kidnapping which was totally disconnected in . . . purpose").

[14] The tax crimes Mr. Rushton was charged with fall under Utah Code sections 76-8-1101, 76-6-513, 76-10-1801, and 76-10-1603. The wage crimes Mr. Rushton was charged with fall under Utah Code sections 76-10-1801, 76-10-1603, 76-2-202, 76-6-513, 76-6-409, and 34-28-12.

conduct constituting a single criminal objective.[15] We conclude that Mr. Rushton's wage crimes are substantively different from Mr. Rushton's tax crimes.

¶ 38 Third, we consider whether each offense involved "different victims." *Letterlough*, 63 F.3d at 336.[16] Mr. Rushton's tax crimes and Mr. Rushton's wage crimes clearly involved different victims. The victim of Mr. Rushton's tax crimes was the government of the state of Utah, and the victims of Mr. Rushton's wage crimes were the former employees of Fooptube. Because the victims in the two cases are completely different, this factor weighs strongly in favor of a finding that Mr. Rushton's conduct did not have a single criminal objective.

¶ 39 The final factor we consider is whether Mr. Rushton had "the opportunity to make a conscious and knowing decision to engage in" the next-in-time offense.[17] *Id.* at 337. There is some overlap in the time

---

[15] We agree with the concurrence that whether one offense furthers the accomplishment of another is one, but not the only, important factor in the mandatory joinder analysis. *Cf. infra* ¶¶ 58, 60, 64 (explaining how to assess whether one offense advances the accomplishment of another). Here, because the wage offenses were not undertaken in furtherance of the tax offenses, nor vice versa, neither advanced the accomplishment of the other.

[16] *See, e.g., Germonto,* 868 P.2d at 60 (finding a single criminal objective when the separate offenses "involved the same victim").

[17] The concurrence contends that this factor "double-count[s] the timing element." *Infra* ¶ 65 n.9 (noting that the statute defines a "single criminal episode" as comprising two components: the offenses must be "closely related in time" and they must be "incident to an attempt or an accomplishment of a single criminal objective" (quoting UTAH CODE § 76-1-401)). We disagree. The threshold requirement that the offense be "closely related in time" must be satisfied *even if* application of the totality of the circumstances test otherwise indicates that the offenses are incident to an attempt or accomplishment of a single criminal objective. The "closely related in time" element serves one purpose: preventing the mandatory joinder of any offenses, no matter how otherwise related they are, that occurred too far apart. The factor we discuss here—whether the defendant had the opportunity to deliberate on whether to engage in the next-in-time offense—on the other hand,

(cont.)

Mr. Rushton committed his tax crimes and the time he committed his wage crimes.[18] However, taxes are paid quarterly, and the paychecks for Fooptube employees were due monthly. *See* UTAH CODE § 34-28-3(1)(a) ("An employer shall pay the wages earned by an employee at regular intervals, but in periods no longer than semimonthly on days to be designated in advance by the employer as the regular payday."). Thus, each crime would have been committed at a different point in time, and, therefore, Mr. Rushton would have had "the opportunity to make a conscious and knowing decision to engage in" the next-in-time offense, even if he committed some of his tax crimes in the same month as some of his wage crimes. *Letterlough*, 63 F.3d at 337. We conclude that the periods of time between Mr. Rushton's quarterly commission of his tax crimes and Mr. Rushton's commission of his wage crimes gave Mr. Rushton adequate opportunity to "make a conscious and knowing decision to engage in" the next-in-time offense. *Id.*

¶ 40   Having conducted this fact-intensive analysis, we determine, based on the totality of the circumstances, that Mr. Rushton's tax crimes and wage crimes did not have a single criminal objective. *Id.* at 336 ("Courts have applied these factors independently, or in conjunction, to decide that a defendant's similar offenses are actually separate and distinct from one another. In essence, if any one of the factors has a

---

helps the court determine whether the two offenses have the same criminal objective. While there will no doubt often be overlap between the "closely related in time" analysis and this factor, a degree of overlap is not the same thing as double-counting. Indeed, overlap is often a feature of legal tests. *See, e.g.*, *Doggett v. United States*, 505 U.S. 647, 651–52 (1992) (describing the "delay before trial" element of the test for whether a defendant's constitutional right to a speedy trial has been violated as "a double enquiry": "[s]imply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay. . . . If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." (citing *Barker v. Wingo*, 407 U.S. 514, 530–34 (1972))).

[18] Mr. Rushton's tax crimes took place from 2005 to 2008, and Mr. Rushton's wage crimes took place during 2008 and 2009.

strong presence, it can dispositively segregate an extended criminal enterprise into a series of separate and distinct episodes." (footnote omitted)). Three of the four factors weigh against a finding of a single criminal objective, and the only other factor (the location where the crimes were committed) is not dispositive. *See supra* ¶ 36. Moreover, no other considerations argue in favor of finding a single criminal objective in this case. We accordingly hold that Mr. Rushton's conduct at issue in the tax case and in the wage case did not have a single criminal objective and that the State therefore was not required to join the charges for Mr. Rushton's tax crimes and the charges for his wage crimes in a single prosecution.

¶ 41 We close with a note on the appropriateness of a totality of the circumstances test in this case. For policy reasons, the concurrence takes us to task for adopting a totality of the circumstances test in the mandatory joinder context. *Infra* ¶¶ 71–73. It points out that multi-factor tests are not as predictable as bright-line legal rules, and it notes that the policy consequences of a misapplication of our multi-factor test could potentially be "drastic"— if a prosecutor fails to join a count that was subject to mandatory joinder, the result will be "the preclusion of a criminal claim without any consideration of the merits." *Infra* ¶¶ 71–72.

¶ 42 While we are hesitant to conclude that predictability is the overriding value in law—other important values are fidelity to text and ensuring that the law does not purchase precision at the cost of anomalous or unjust results—we agree with the concurrence that courts must always be attuned to the risk that a test might prove difficult to apply. But we think the risk of unpredictability is low here. Many other jurisdictions use multi-factor tests to determine whether mandatory joinder is required, *see supra* ¶ 35 n.11, and we have been given no reason to think that the law in those jurisdictions is unpredictable. Moreover, as we have explained, it is not clear that the concurrence's test would be any more predictable than ours—indeed, it could well be less predictable. *See supra* ¶ 24.

¶ 43 As for the concurrence's concern about the "drastic consequence[]" of criminal claim preclusion due to a prosecutor's failure to join counts, *infra* ¶ 72, it is fair as far as it goes, but the analysis is fatally incomplete. The policy question in this case is not simply whether we should make it harder or easier for prosecutors to prosecute all the offenses that a defendant might fairly be charged with. Instead, the policy question is comparative: whether it is more important to prevent the "drastic consequence[]" of criminal claim

preclusion due to the prosecutor's failure to join counts or to prevent the "drastic consequence[]" of serial prosecutions when claims otherwise ought to have been joined. While this consideration is secondary to the textual and doctrinal factors that have persuaded us to adopt the test we announce, we think that it will generally be less costly for a prosecutor to over-join counts than it is for a defendant to defend against serial prosecutions.

¶ 44   As a final note, litigants in a criminal case—both prosecutor and defendant—may always move the district court to join counts that the law does not require be joined and to sever counts that are otherwise subject to mandatory joinder. *See* UTAH R. CRIM. P. 34 (allowing motions to consolidate criminal cases); UTAH R. CRIM. P. 9.5(1)(b) (allowing separation of offenses otherwise required to be joined "for good cause shown"). Thus, neither the concurrence's nor our test is liable to change the ultimate joinder determination in the vast majority of criminal cases. We agree with the concurrence that "the practical effect of [its] test is not . . . sweeping." *Infra* ¶ 69. Nor, for that matter, is the practical effect of ours. But, at the margin, the test for mandatory joinder that we adopt today will yield results that are not only more faithful to text and structure, but fairer and more rational as well.

## CONCLUSION

¶ 45   In conclusion, we reject Mr. Rushton's characterization of misappropriation as his single criminal objective because such a definition is too broad and would render the permissive joinder statute inoperative. Instead, we consider the totality of the circumstances to determine whether Mr. Rushton's conduct had a single criminal objective. Because Mr. Rushton's tax crimes and wage crimes were substantively different and involved different victims, and because Mr. Rushton had the "opportunity to make a conscious and knowing decision to engage" in the next-in-time offense, we conclude that Mr. Rushton's criminal conduct did not have a single criminal objective. *See United States v. Letterlough*, 63 F.3d 332, 337 (4th Cir. 1995). Because Mr. Rushton's conduct did not have a single criminal objective, it was not a single criminal episode under the mandatory joinder statute. Therefore, we hold that the mandatory joinder statute did not require joinder of Mr. Rushton's tax crimes and wage crimes in a single prosecution, and we affirm the court of appeals' decision upholding the denial of Mr. Rushton's motion to dismiss.

ASSOCIATE CHIEF JUSTICE LEE, concurring in the judgment:

¶ 46 Utah Code section 76-1-403 prescribes a rule of criminal claim preclusion. It states that the prosecution of "one or more offenses arising out of a single criminal episode" may bar the "subsequent prosecution for the same or a different offense arising out of the same criminal episode" if certain conditions are met. UTAH CODE § 76-1-403(1).

¶ 47 Here we are asked to define the scope of a "single criminal episode." The majority does so by articulating a "totality of the circumstances" test turning on at least four factors—"the location where the crimes were committed, the nature of the offenses, whether the crimes involved different victims, and whether the defendant had the opportunity to deliberately engage in the next-in-time offense." *Supra* ¶ 12. Applying this test, the court concludes that a prior prosecution of David Rushton on criminal tax charges does not foreclose the present prosecution on charges arising out of his failure to pay earned wages to employees. Because "[t]hree of the four factors" identified by the court "weigh against a finding of a single criminal objective," the majority holds "that Mr. Rushton's tax crimes and wage crimes did not have a single criminal objective." *Supra* ¶ 40. And it therefore affirms the court of appeals' decision allowing the prosecution on the wage offenses to move forward.

¶ 48 I agree with the judgment of the court—its affirmance of the court of appeals' decision allowing the wage case to move forward. But I disagree with the majority's analysis. I would not define the statutory terms by reference to a multi-factored balancing test. Instead, I would articulate a test based on the operative terms of the controlling statute. The operative language precludes subsequent prosecution for criminal "conduct" that is "closely related in time" and "incident to an attempt or an accomplishment of a single criminal objective." UTAH CODE § 76-1-401. The phrase "incident to an attempt or an accomplishment of a single criminal objective" is controlling here. I would affirm on the ground that Rushton's wage offenses were not *incident to* the attempt or accomplishment of the earlier-charged tax offenses. Accordingly, I would hold that the statute does not preclude prosecution for the wage offenses.

¶ 49 In the paragraphs below I first present the textual basis for the operative test as I see it. Next I identify a significant shortcoming of the majority's "totality" test—the fact that it will not cover some

conduct that is clearly "incident to an attempt or accomplishment" of a principal "criminal objective." Last I close with some observations about the appropriate domain of balancing tests and the importance of predictability in a field like claim preclusion.

I

¶ 50 The majority rejects Rushton's formulation of "single criminal episode." It says that the wage offenses and tax offenses cannot be deemed to stem from a "single criminal objective" simply because they advance a nefarious "objective" framed at a high level of generality. *Supra* ¶ 16. Quite right. If the identification of an *overarching bad purpose* were enough to sweep in all charges deemed to advance it, the *single criminal episode* provision would be all-encompassing. Or at least it could potentially be so for a defendant whose lawyers are creative enough to formulate a nefarious purpose at a high level of generality. And that is not hard to do.

¶ 51 In this case, Rushton asserts that the relevant "single criminal objective" is to prop up his business through general "misappropriation." That is certainly *a* nefarious objective; and it would encompass both the wage offenses and the tax offenses in this case. But why stop at this level of generality? An alternative formulation would be the purpose of advancing Rushton's interests by engaging in criminal activity. And *that* criminal objective would sweep in all conceivable crimes—even crimes as diverse as a sexual assault committed on one day and a count of securities fraud committed three weeks later.

¶ 52 All of this tells us that "single criminal objective" cannot be defined in the abstract. If it were, the preclusive effect of section 76-1-402 would be all-encompassing. And, as the majority notes, this approach would eviscerate the permissive joinder statute, Utah Code section 77-8a-1(1), which *permits* joinder for offenses that are "based on the same conduct or are otherwise connected together in their commission" or "alleged to have been part of a common scheme or plan." *See supra* ¶ 16. If all crimes said to advance a general purpose of criminality *must* be charged jointly because they are part of a single criminal episode, then joinder would never be permissive. That cannot be if we are to preserve meaning for the permissive joinder provision.

¶ 53 And that means that we must embrace a narrower notion of "single criminal objective." The majority does so by considering the "totality of the circumstances," meaning the series of considerations

that the court deems relevant to this inquiry—the location of the two crimes, the nature of the offenses, the identity of the victims, and the opportunity to "deliberately engage in the next-in-time offense." *Supra* ¶ 12. Yet the court proffers no linkage between the factors it includes in its balancing test and the operative terms of the statute.[1] Instead, the

---

[1] The majority professes general obeisance to the "plain meaning" of the statutory text. *See supra* ¶ 23. But, tellingly, the court nowhere seeks to connect its multi-factored test with the language of the statute. That test is weaved of whole cloth having nothing to do with the terms of section 76-1-401. So the majority is in no position to claim the high ground of "plain meaning" textualism.

The majority's criticism, moreover, is rooted in a faulty premise. It says that "if the legislature had intended" the standard I propose, it "would have" done so explicitly. *Supra* ¶ 23. But we have rejected such syllogisms repeatedly. We have noted that "the legislature's failure to speak more clearly tells us little or nothing about its intent in using terms that are less clear." *Irving Place Assocs. v. 628 Park Ave., LLC*, 2015 UT 91, ¶ 16, 362 P.3d 1241. And we have observed that "[i]n any matter of statutory construction of any consequence, it will almost always be true that the legislature could have more clearly repudiated one party's preferred construction." *Id.* (quoting *Hill v. Nakai (In re Estate of Hannifin)*, 2013 UT 46, ¶ 25, 311 P.3d 1016). We have also explained that "'the converse is almost always true as well.'" *Id.* (alteration in original) (citation omitted). For that reason, we have said that "'[t]he legislature's failure to speak more clearly' yields no basis for interpreting the ambiguous terms it voted into law." *Id.*; *see also Craig v. Provo City*, 2016 UT 40, ¶ 38, 389 P.3d 423 ("It is usually quite beside the point that the legislature 'knows how' to speak more explicitly. That is another way of saying that the legislature could have spoken more clearly. And typically that gets us nowhere." (footnote omitted)). That is all the majority is saying here. And in any event the legislature's failure to adopt a clearer standard does not mean that it preferred the multi-factored balancing approach favored by the majority. Again, nothing in the text supports the factors articulated by the court.

The court's argument also misstates my standard. I am not simply "equat[ing] a 'single criminal episode' with a single 'crime.'" *Supra* ¶ 22. The use of the term "objective" has significance that is not as clearly conveyed by the term "offense." The word "objective" identifies

(cont.)

---

court imports a test set forth in a federal court of appeals decision under a federal statute that bears little resemblance to the operative Utah provisions. *See supra* ¶¶ 36–39.[2]

¶ 54 The cited federal case is *United States v. Letterlough*, 63 F.3d 332 (4th Cir. 1995). *Letterlough* is a case arising under the federal Armed Career Criminal Act, 18 U.S.C. § 924(e)(1). The cited statute provides for a sentencing enhancement—a mandatory minimum of fifteen years to life—for a person convicted of unlawful possession of a firearm under 18 U.S.C. § 922(g) who "has three previous convictions . . . for a violent felony or serious drug offense, or both, committed on occasions different from one another." 18 U.S.C. § 924(e)(1). The *Letterlough* court articulated factors of relevance to the determination whether past crimes were "committed on occasions different from one another." *Id.* Citing cases from other circuits, the *Letterlough* court held that "a multiplicity of factors" help to indicate "when more than one conviction constitutes a separate and distinct criminal episode." 63 F.3d at 335. And the cited factors include those embraced by the majority in

---

the reference point for a court's "incident to" analysis. The conduct at issue must be incident to the acts undertaken in attempting or accomplishing the relevant "objective" crime. The term "objective" thus aids—rather than hinders—a proper understanding of the analysis required by the statute.

[2] I see a parallel between the majority opinion here and that in *State v. Shickles*, 760 P.2d 291, 295 (Utah 1988). *Shickles* identified factors to guide decisions weighing evidence under rule 403 of the Utah Rules of Evidence. *Id.* at 295–96. Yet the *Shickles* factors were not rooted in the text of the operative rule; they were "drawn from" the McCormick on Evidence treatise. *State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841. And in time we were forced to repudiate the *Shickles* factors—identifying unforeseen consequences arising from an attempt to formulate factors not rooted in the text of the governing law, and backing away from the *Shickles* factors and pointing the courts back to rule 403. *Id.*

I foresee a similar path ahead under the single criminal objective statute. The *Rushton* factors seem destined to be applied in unforeseen ways in future cases, leading to results that cannot be squared with the operative text of the statute. When that happens we will be forced to formulate a test more tied to the terms of the statute.

this case—"whether the offenses arose in different geographic locations; whether the nature of the offenses was substantively different; and whether the offenses involved multiple victims or multiple criminal objectives." *Id.* at 335–36 (footnote omitted). In addition, the *Letterlough* court also considered whether the defendant had "the opportunity to make a conscious and knowing decision to engage in [the next-in-time offense.]" *Id.* at 337.

¶ 55    These factors may well be appropriate in assessing whether a series of crimes were "committed on occasions different from one another." But the quoted language comes from 18 U.S.C. § 924(e)(1). And those terms appear nowhere in the operative Utah provision, Utah Code section 76-1-401.

¶ 56    The question under section 401 is not whether a later-charged crime was committed *on an occasion different* from that of an earlier-charged offense. It is whether the two sets of offenses are "closely related in time" and are "incident to an attempt or an accomplishment of a single criminal objective." UTAH CODE § 76-1-401. Thus, so long as the time-relatedness element is met,[3] subsequent prosecution is barred only if it arises out of conduct that is "incident to an attempt or an accomplishment of a single criminal objective." *Id.*

¶ 57    The statutory phrase "incident to" modifies or extends to both "an attempt . . . of a single criminal objective" and "an accomplishment of a single criminal objective." It accordingly defines the scope of "conduct" that comprises a "single criminal episode." Conduct that is *not* "incident to" an "attempt" or "accomplishment" of a "single criminal objective" may be charged separately because it does not comprise a "single criminal episode" under the statute.

¶ 58    The words "attempt" and "accomplishment" have well-defined meanings in the criminal law. An "attempt" is itself a crime involving conduct that is a "substantial step toward commission of [a specified] crime" wherein the defendant "intend[ed] to commit the

---

[3] I would consider the time-relatedness factor separately. That is an independent element of a "single criminal episode." And it confuses the matter—and double-counts the time element—to consider time as a factor of relevance to the requirement of a "single criminal objective." *See infra* ¶ 65 n.9.

[specified] crime." UTAH CODE § 76-4-101(1).[4] And the term "accomplishment" or "accomplish" refers to the completion of all the elements of a crime identified in the criminal code.[5] Because this statute appears in the criminal code, speaks in terms of a *criminal* objective, and identifies timing requirements for criminal prosecutions, I would give these terms their criminal law meanings. *See In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 109, 266 P.3d 702 (Lee, J., concurring) ("'Words of art bring their art with them,' and courts have commonly assumed that 'where [a legislature] borrows terms of art . . . , it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.'" (second alteration in original) (footnote and citations omitted)).

¶ 59 In their criminal law senses, both attempt and accomplishment are used in relationship to an identifiable offense in the criminal code. They refer, in other words, to a specific crime that was attempted or accomplished. Accordingly, in the context of the statutory definition of "single criminal episode," these terms have reference to the "objective" of either attempting or accomplishing a specific offense. So the "objective" referenced in the statute is not, as

---

[4] *See also* BLACK'S LAW DICTIONARY 146 (10th ed. 2014) (defining "attempt" as "1. The act or an instance of making an effort to accomplish something, esp. without success. 2. *Criminal law.* An overt act that is done with the intent to commit a crime but that falls short of completing the crime.").

[5] *See, e.g.*, *State v. Castonguay*, 663 P.2d 1323, 1326 (Utah 1983) (stating in an attempted murder case that "it must be borne in mind that an attempt transcends intent, yet fails to culminate in its planned accomplishment"); *State v. Musser*, 175 P.2d 724, 731 (Utah 1946) (stating that "a criminal conspiracy . . . consists of an unlawful agreement plus some overt act or acts done to further or to *accomplish the object of such an agreement*"; also noting that "[a]n act done in furtherance of an agreement need not succeed in accomplishing *its objective* in order to fulfill the requirements of the statute") (emphases added), *vacated and remanded on other grounds in Musser v. Utah*, 333 U.S. 95 (1948); *State v. Mortensen*, 83 P.2d 261, 262–63 (Utah 1938) (reversing attempted rape conviction on the ground that there was "no act which can be said to be designed to accomplish the act of intercourse").

Rushton asserts, some hazy nefarious purpose. Nor is it an unlawful purpose defined vaguely by a totality of the circumstances. It has reference, rather, to a particular crime—a "single" "objective" crime that the defendant either "attempt[ed]" or "accomplish[ed]." *See* UTAH CODE § 76-1-401. Thus, for the prosecution of a crime to be barred by the statute, the conduct underlying that crime must have been "incident to" the attempt or accomplishment of *the identified objective crime*.

¶ 60 The "incident to" element is the language of connection or causation.[6] One event or act is "incident to" another if it arises out of it or is otherwise connected to it—as in a risk "incident to" employment or a search "incident to" an arrest. I would interpret the statutory reference to an offense "incident to an attempt or an accomplishment" of the objective crime in this sense. I would require proof of some connection or relationship between the two offenses.[7]

---

[6] *See* BLACK'S LAW DICTIONARY 146 (10th ed. 2014) (defining "incident" as "[d]ependent on, subordinate to, arising out of, or otherwise connected with (something else, usu. of greater importance) <the utility easement is incident to the ownership of the tract>"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1142 (3d ed. 2002) (setting forth the "law" definition of the word "incident" when used as an adjective: "dependent on or appertaining to another thing: directly and immediately relating to or involved in something else though not an essential part of it.").

[7] Perhaps this inquiry will introduce some uncertainty. That is one of the majority's complaints about my approach. *See supra* ¶ 24. But the "incident to" element is an explicit component of the statutory test. If we are concerned about the fuzziness of the inquiry then we should do our best to bring clarity to the analysis; we are in no position to write it out of the law (as the majority does in its test). *See supra* ¶ 45 ("Because Mr. Rushton's conduct *did not have a single criminal objective*, it was not a single criminal episode under the mandatory joinder statute." (emphasis added)). I would bring clarity to "incident to" by drawing upon analogies in other areas of the law, which treat "incident to" as the language of connection or causation. Our cases can iron out any wrinkles in this formulation in due time.

The majority, moreover, is in no position to make the plea for certainty. Its "totality of the circumstances" test requires uncertainty

(cont.)

¶ 61   The statutory test accordingly consists of two steps. First, the court must identify the "single criminal objective"—the objective crime—at issue.[8] Second, the court must determine whether the defendant's other criminal conduct was *incident to* the attempt or accomplishment of the objective crime.

¶ 62   Because the statute prohibits successive "prosecution" for offenses that are part of a single criminal episode, *see* UTAH CODE § 76-1-403, I would conduct this analysis by reference to the documents setting forth the basis for the prosecution (the criminal information or indictment). And I would hold that Rushton's wage offenses were not *incident to* an attempt or accomplishment of his tax offenses. Rushton made no effort to show any relationship between the conduct underlying his tax offenses and the conduct underlying his wage offenses—let alone one that could be described as "incident to," under the statute. He argued only that both the tax offenses and the wage offenses fall under the same general objective of misappropriating funds. That is plainly insufficient. To fall within the preclusive sweep of the statute, Rushton's tax offenses would have to be shown to be incident to—or directly and immediately relating to—an attempt or accomplishment of his wage offenses. No such showing was made here, and Rushton's argument should fail on that basis.

II

¶ 63   The majority takes a completely different tack. It adopts instead a multi-factored balancing test. But that test is completely disconnected from the operative statutory language. And it will also lead to problematic results.

¶ 64   An inchoate offense, in my view, is clearly "incident to an attempt or an accomplishment of a single criminal objective." UTAH CODE § 76-1-401. Surely a conspiracy to commit bank robbery, for example, is "incident to an attempt or an accomplishment" of the bank robbery. So if such offense is "closely related in time" to the principal

---

from case to case. *See infra* ¶¶ 71–72 (noting further concerns about the unpredictability of the majority's test).

[8] Either of two crimes could be the "objective." The analysis would turn on whether the conduct underlying one of the crimes at issue was *incident to* the attempt or accomplishment of another crime.

offense it is aimed at facilitating, it must necessarily be barred if not included in the prosecution of the principal offense.

¶ 65 Yet the majority's multi-factored balancing test could easily lead to the opposite conclusion. Consider a case involving a bank robbery preceded by solicitation of an accomplice. The act of solicitation is undoubtedly "incident to" the "accomplishment" of the "criminal objective" of bank robbery. So the crime of solicitation should be foreclosed if closely related in time and not charged in connection with an initial prosecution for the bank robbery. But that crime may not be barred under the majority's test. If, for example, the accomplice resides in a different state, the majority's factors could easily weigh against a requirement of joinder in the initial bank robbery case, since the offenses could be said to arise in a "different geographic location[]," *supra* ¶ 36; the solicitation offense is "substantively different" in "nature" from bank robbery, *supra* ¶ 37; and the defendant "had 'the opportunity to make a conscious and knowing decision to engage in' the next-in-time offense," *supra* ¶ 39.[9] That makes three of four factors

---

[9] The majority's test also seems problematic for an additional reason: Even if we assume the propriety of a multi-factored test, the majority's standard seems to double-count the timing element. The operative statute tells us that time-relatedness is an inquiry distinct from the "single criminal objective" element. *See* UTAH CODE § 76-1-401 (defining "single criminal episode" as one involving two sets of offenses that are "closely related in time" and "incident to an attempt or an accomplishment of a single criminal objective"). So the assessment of "opportunity to make a conscious and knowing decision" seems to amount to double-counting.

I have no quarrel with the notion that "overlap is often a feature of legal tests." *Supra* ¶ 39 n.17. But my point is not to raise a general objection to "overlap" in all circumstances; it is to suggest that the separate existence of a "closely related in time" test calls into question the statutory basis for a time component of the "single criminal objective" test. Thus, the existence of overlap in legal tests formulated in other areas of the law tells us nothing about the appropriate standard for analyzing a "single criminal objective." And the separate nature of the "closely related in time" standard undermines the existence of a time component for assessing "single criminal objective."

that cut against the conclusion that these offenses are "incident to" the "accomplishment" of the "criminal objective" of bank robbery.

¶ 66  This is troubling. If the factors we identify fail to sweep in classic crimes "incident to an attempt or accomplishment of a single criminal objective," then it's time to go back to the drawing board. I would do so by giving the terms attempt, accomplishment, and criminal objective the meaning those terms have in the criminal law. And I would hold that Rushton's wage offenses are not precluded here because he has made no effort to identify any relationship between the conduct underlying the two distinct sets of crimes.

¶ 67  The majority objects to my test as underinclusive, citing an example of a series of thefts "from ten separate accounts belonging to ten separate clients of the same bank," brought about by a "computer program" written by a defendant who admits to a goal of stealing "small enough increments that (in his view) were less likely to immediately trigger the bank's anti-fraud measures." *Supra* ¶¶ 24–25. In the court's view, these offenses "ha[ve] a single criminal purpose underlying" them, as witnessed by the defendant's contemporaneous admission of his intent. *Id.* ¶ 26. And because my test would allow "serial prosecutions" of these multiple choate offenses, the majority insists that my approach must be dismissed as underinclusive. *Id.*

¶ 68  I disagree for several reasons. For one thing, the court's conclusions are premised on its own take-our-word-for-it sense of the scope of "single criminal episode." It confidently announces its belief that "[t]he state should not be allowed to bring serial prosecutions against" a defendant in these circumstances. *Id.* But it offers no basis in the words of the statute for that conclusion. So the court's criticism (of the underinclusiveness of my test) is entirely circular. In my view, it is the majority's test that is under- and overinclusive—or at least potentially so, in that the multi-factored balancing test makes it impossible to predict with any certainty which crimes will be deemed to be encompassed within a "single criminal episode."

¶ 69  Second, the practical effect of my test is not nearly as sweeping as the court imagines. "[S]erial prosecutions" will ensue only if the prosecution chooses to exercise its discretion to charge these crimes separately. And a rational prosecutor seems highly likely to charge these hypothetical crimes together for a range of practical reasons. Even if related cases are charged separately, moreover—as with the court's secondary example of "a hacker who simultaneously

acquires unauthorized access to one million computers," *id.*—there is no reason to expect "one million trials." *Id.* Cases can be charged separately but ultimately consolidated for trial. UTAH R. CRIM. P. 34. So the majority overstates the practical concern implicated by my test.

¶ 70  Finally, the majority's concerns about underinclusiveness are not necessarily alleviated by its test. The virtue of a "totality of the circumstances" test is its flexibility. But that is also its principal vice. And I cannot see how a prosecutor could predict how the multiple bank theft or computer hacking counts would fare under the majority's test. In both cases there are some factors pointing in favor of mandatory joinder (location, similar conduct) and others pointing the other way (different victims, neither offense is incident to the attempt or accomplishment of the other). The majority, moreover, goes out of its way to say that the listed considerations "are certainly not the only factors relevant to the mandatory joinder analysis." *Supra* ¶ 35. So it seems impossible to anticipate with any certainty how the court's own hypotheticals would come out under its test. It is entirely possible that the examples it lists would come out the same under both tests.

## III

¶ 71  A totality-of-the-circumstances test is a tempting response to a complex legal problem. And such a test may have a place in the law— in a field, for example, where precision is untenable (or unimportant) and flexibility is at a premium.[10] But this is not such a field.[11] The

---

[10] *See United States v. Mead Corp.*, 533 U.S. 218, 241 (2001) (Scalia, J., dissenting) (deriding "th'ol' 'totality of the circumstances'" as "that test most beloved by a court unwilling to be held to rules (and most feared by litigants who want to know what to expect)").

[11] There is a rich literature on the virtues and vices of objective rules and subjective standards. Nearly everyone agrees that there is a place in the law for both. But even the pro-standards crowd acknowledges that balancing tests are problematic in fields in which predictability is at a premium. *Compare* Antonin Scalia, *The Rule of Law As a Law of Rules*, 56 U. CHI. L. REV. 1175, 1182 (1989) (stating that "predictability is destroyed" when courts adopt tests based on the "totality of the circumstances" or "a balancing of all the factors involved") *with* Cass R. Sunstein, *Must Formalism Be Defended Empirically?*, 66 U. CHI. L. REV. 636, 654 (1999) (acknowledging that
(cont.)

flipside of flexibility is unpredictability. And predictability is at a premium in the field of claim preclusion.

¶ 72   A prosecutor faced with the question of how widely to frame an information or indictment must anticipate the preclusive effect of such a decision.[12] A misjudgment in this field will produce drastic consequences—the preclusion of a criminal claim without any consideration of the merits. Such a consequence should be the predictable result of a reasoned decision. And we thwart that possibility when we do no more than articulate a series of "factors" to be balanced in some unspecified way.

¶ 73   I would avoid that problem here. I would do so by rejecting the majority's "totality" test in favor of a more objective rule rooted in the operative terms of the governing statute. And I would affirm under that test.

––––––––––––

although the "issue[] [is] hard to resolve in the abstract," "[w]here predictability is especially important—such as in areas involving commercial and criminal law—formalism [which seeks to limit judicial discretion] might be favored.").

[12] Surely this is an additional "purpose of the mandatory joinder statute." *See supra* ¶ 35 (listing other purposes). We should not assume that a statute like this one is aimed at accomplishing only a limited set of objectives on one side of the scale. We should recognize the reality that this statute, like most all others, is aimed at balancing competing objectives, including that of the prosecution in the exercise of its discretion. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 23 n.6, 248 P.3d 465 ("[M]ost statutes represent a compromise of purposes advanced by competing interest groups, not an unmitigated attempt to stamp out a particular evil.").